Robert L. UNGERER, et al.,
Plaintiffs, Appellants,

v.

Charles L. SMITH, City of Pittsfield,
Defendants, Appellees.

No. 84–1659.

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1985.
Decided June 21, 1985.

Gary S. Matsko, Boston, Mass., with whom Paul L. Feldman and Davis, Malm & D'Agostine, Boston, Mass., were on brief for plaintiffs, appellants.

John D. Lanoue, Adams, Mass., with whom J. Norman O'Connor, Philip H. Grandchamp and Donovan & O'Connor, Adams, Mass., were on brief for defendants, appellees.

Before TORRUELLA and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

In the fall of 1978 the then mayor of defendant City of Pittsfield, Paul Brindle, and plaintiffs Ungerer et al. (sometimes Pyramid) reached an understanding that plaintiffs should construct a retail shopping mall in Pittsfield with the city's assistance. The questions are whether the evidence supports a finding that this understanding reached a point in form and substance sufficient to constitute a contract, and whether, if it did, it was legally binding on the city. Contract or not, the understanding was subsequently repudiated by defendant Charles L. Smith when he succeeded Brindle as mayor in 1980, for which action separate claims are made against him personally. As an affirmative defense, defendants claim that it was plaintiffs who failed to perform. We need reach only the question of enforceability.

■ When plaintiffs rested on the sixth day of trial, the court directed a verdict for defendants on all counts on the ground that Mass.G.L. c. 43, § 29, applicable to certain municipal contracts of $2,000. or more, requires a written contract with the mayor's approval "affixed thereto."[1] The court stated "[t]he purpose of the statute was not to give limitless power to the Mayor to bind a city ... [but] to limit such power in order to protect a city's treasury." Unfortunately, it is just the opposite. The statute is directed not to restricting the mayor, but to restricting contracts made by a "department, board or commission," without the mayor's written approval. "The purpose ... is to limit the power of public officials ... so as to unify the control of the city's commercial transactions, and

guard against waste by departments in the government. . . . [T]he mayor must be able to exercise his 'practical wisdom in the administration of the affairs of the city.'" *Urban Transport, Inc. v. Mayor of Boston*, 373 Mass. 693, 697, 369 N.E.2d 1135 (1977) (citations omitted). To say that a statute intended to give the mayor control over contracts made by departments, boards, and commissions limits his own contracts, misreads both its language and its purpose. And, indeed, defendants, in placing less than half-hearted reliance upon this statute in their brief, apparently recognize as much.

It does not follow, however, that it was error to direct a verdict. We return to the beginning. There is no question of the city's authority to agree to a mall, parking garage and street improvements. Mass. G.L. c. 40 § 5 provides,

Section 5. Authorization.

A town may at any town meeting appropriate money for the exercise of any of its corporate powers, including the following purposes: ...

(4) For laying out, discontinuing, making, altering and repairing public ways, and for materials used and labor employed thereon. . . .

(33) For acquiring land ... for public parking places and maintaining the same. . . .

(64) For the purpose of establishing, constructing and maintaining shoppers' malls within the public ways, includng the paving, landscaping and beautification thereof and the installation of utilities and other public conveniences thereat. . . .

We turn, accordingly, to the mayor's powers, and whether plaintiffs' asserted con-

---

* Of the District of Rhode Island, sitting by designation.

1. On this appeal, in urging need of a writing, defendants would also cite sections of the statute of frauds, Mass.G.L. c. 259. This statute is an affirmative defense that must be pleaded. F.R.Civ.P. 8(c). Defendants did not plead it, and the court did not consider it; nor will we.

Chapter 43, § 29, on which the court relied, was also not pleaded, but since, if applicable, it affected the making of the contract, it did not need to be pleaded. At the same time we confess to wondering why a case should be tried for six days if there was a complete statutory defense.

tract complied with formal legislative prerequisites other than chapter 43 § 29.

■ Plaintiffs allege that the mayor agreed, on behalf of the city, to construct a 3,000 car parking garage, and to make necessary improvements and additions to the streets adjacent to the mall and garage, all subject to the city's obtaining federal and state funding. Defendants, noting that the mayor's agreement was not in writing, invoke, as "clearly applicable," Mass.G.L. c. 40, § 4B and Pittsfield City Charter Section 40. These require advertising for sealed bids on purchases of "equipment, supplies or materials," and on construction, beyond certain costs. In agreeing to undertake the project, however, the mayor was not purchasing, nor was he designating the plaintiffs or any other contractor. It is only when those steps are reached that advertising is required. *See, e.g., Cerwonka v. Saugus,* 316 Mass. 152, 153, 55 N.E.2d 1 (1944); *Ryan v. Somerville,* 328 Mass. 324, 325, 103 N.E.2d 707 (1952).

■ Equally mistaken is defendants' claim that Mass.G.L. c. 44, § 31, limiting the city's liability to the amount then appropriated, invalidates the mayor's contract, no appropriation having been made in October, 1978 when it was allegedly created. *Cf. Adalian Brothers, Inc. v. Boston,* 323 Mass. 629, 630–32, 84 N.E.2d 35 (1949); *Ryan,* 328 Mass. at 326, 103 N.E.2d 707. This section appears under a subchapter entitled "Department Appropriations." It is inapplicable to the mayor for the same reasons as concern Mass.G.L. c. 43, § 29, ante.

Without proceeding further along this line, there is a much more serious and, indeed, fatal obstacle. With respect to streets, significant modifying and improving of public ways was an essential part of the mall undertaking. In their letter to Brindle of October 27, 1978, which they now describe as the contract, plaintiffs provided that their "commitment to construct such a shopping center is subject to the following:

. . . .

2. Construction by the City of Pittsfield of adequate street and traffic improvements including. . . ."

Although throughout their brief plaintiffs state that the City's "principal responsibility was to provide a free parking structure," the street improvements were of a substantial nature. The HUD loan application, dated October 31, 1978, refers broadly to "an improved streetscape . . . [whereby] existing and future traffic congestion will be minimized." Even a casual glance at an over one-hundred page Traffic Impact Study accompanying the Plan would show, "construction of the . . . Francis Street extension to Old West Street;" "construction of new West Street;" "North Street Widening—An additional southbound lane;" "East Street should be widened." While possibly not all of this was part of mall servicing, but related to the area's overall neighborhood improvement, much of it was needed for the increased flow that would be generated by the mall. It was beyond the mayor's powers to agree to this.

■ Assuming the mayor can contract on behalf of the City for many things, streets and ways are an exception. Section 35 of Pittsfield's charter provides,

"The city council, except as provided in section twenty-three,[*] shall have *exclusive* authority and power to order the laying out, locating anew or discontinuing of, or making specific repairs in all streets and ways, . . ."

---

* Section 23 empowers the mayor to require the city council to reconsider and re-vote on its orders and decisions, leaving the ultimate power in the council.

(Emphasis supplied.)

The broadest possible general powers in a mayor to contract cannot override a specific statutory assignment of authority to another department. *Fiske v. Worcester,* 219 Mass. 428, 429–30, 106 N.E. 1025 (1914). Accordingly, the project's enforceability hangs on city council approval.

■ Plaintiffs' first approach is to say that "the City Council was not required to vote on the project beyond making an ap-

propriation," citing the charter generally, but without noting Section 35. They then add, "Nonetheless, the City Council, on October 30, 1978, December 20, 1978, January 23, 1979, July 17, 1979, September 25, 1979, and December 26, 1979, voted to move forward with the Project as initially agreed to in October 1978." Unfortunately for plaintiffs, this is not the case. Whatever Ungerer and Brindle testified that they orally agreed to in October, 1978, the council agreed to nothing, except to authorize an application for a $24,850,000. HUD grant. Not only did plaintiffs' commitment letter of October 27, 1978, state that their "Commitment is made with the understanding that a legally binding agreement between (sic) the City will need to be executed upon approval of the City's Action Grant application," but by letter of October 30, contemporaneous with the council's vote, "Pyramid acknowledges that the submission of the UDAG application (including the commitment letter ... to the City contained therein) does not (1) constitute a commitment by the City of Pittsfield to undertake any of the activities outlined in the UDAG application...." Consequently, its October 30 vote authorizing the application bound the council to nothing. Consistent therewith, it was stated at the meeting that the council "would have many opportunities to vote on the project."

At the December 20, 1978 meeting the council adopted an order appropriating $8,500,000. "as the city's share of the cost" of the project. However, again there was no firm commitment. The order stated,

"Provided that the City Council by vote hereafter determines that the funds appropriated herein, together with grant funds authorized by the United States of America and the Commonwealth of Massachusetts are sufficient to meet the estimated public cost to complete the foregoing."

Before voting, various councilors inquired as to the binding effect of the vote, viz-a-viz the project. Inter alia, Attorney Grandchamp said, "[T]he traffic was wholly within the purview of the council ... [that] the critical vote was yet to come ... [and that]

if the U.D.A.G. granted less than the twenty-four million dollars ... that would require a new vote and new legislation." The quoted proviso made this last point apparent.

The January 23, 1979 vote referred to by plaintiffs merely affirmed the December 20 vote. On July 17, 1979 the council voted to approve "the general design, character, location, dimensions and siting of the regional shopping mall and the three-level parking garage," with several important reservations for reconsideration. This was a vote of confidence, and not formal adoption of a contract, as one of the council's reservations concerned certain traffic alterations and it authorized an "investigation and [a] report in regard to the feasibility" of certain other street alterations. On September 25, 1979 the council authorized the mayor to sign the Urban Development Action Grant Contract. But, this again, was not a contract with plaintiffs, the execution of which was not yet accomplished, as indeed, a recorded comment from the floor made clear. The crunch came on December 13, 1979, when it became apparent what were the consequences of HUD's grant of $14,200,000 rather than the $24,-850,000 originally requested. Plaintiffs would neglect this altogether and have submitted a 59 page brief without even mentioning, let alone discussing the consequences of, this very substantial reduction. All they say is,

"The evidence of the conduct of the parties confirmed the Ungerer-Brindle testimony that they had an agreement. Both parties performed pursuant to that agreement for over sixteen (16) months. The City sought and obtained a $14.2 million UDAG grant...."

It is true that when HUD said it would grant only $14.2 million the city made application therefor, but this was not a commitment. Rather, the council voted, "that the City Council move forward with the proposed concept," and "A. That the council direct Attorney Philip H. Grandchamp to begin contract negotiations with Pyramid as suggested by H.U.D. to retain the $14,-

200,000; ..." Many proposed terms for such were noted. They were never agreed to.

Finally, contrary to plaintiffs' assertion, there was no vote on December 26, 1979.[2]

It is to be greatly doubted whether it could be found that the city council even provisionally agreed to the project, more particularly the street construction and improvements, on a $24,850,000 basis. In any event, it is plain that it never agreed on the basis of a HUD contribution of only $14.2 million. With no approval of the essential "traffic [requirements] wholly within the purview of the council," ante, plaintiffs must fail.

There is no need to pursue other doubtful questions, or possible personal liability of defendant Smith. He could not be liable for interfering with a contract, because there was none. As to claimed interference with advantageous business relations, even if the court had admitted the evidence that Smith had a friend who opposed the mall, offered to show he was not performing properly his official functions, it would have been insufficient. *Laurendeau v. Kewaunee Scientific Equipment*, 17 Mass. App. 113, 456 N.E.2d 767, 773 (1983). There was no other evidence.

The district court looked to the wrong statute, but its result was correct.

Affirmed.

---

2. Plaintiffs also offer two public referenda as council approval. But defendants aptly note that the December 1978 and April 1979 referenda were nonbinding under Mass.G.L. c. 53

§ 18A. The Pittsfield City Charter did not provide for a referendum procedure until October 1983. In any case, these referenda occurred before HUD awarded a greatly reduced grant.