**UNITED STATES of America, Plaintiff,**

v.

**UNITED STATES TRUST COMPANY, et al., Defendants.**

Civ. A. No. 84–3346 Mc.

United States District Court, D. Massachusetts.

Aug. 5, 1986.
Judgment Dec. 9, 1986.

See also 106 F.R.D. 474.

Andrew S. Hogeland, Asst. U.S. Atty., for the U.S.

Lenore C. Sherrill, Marblehead, Mass., for Torres Const. Co. Inc.

Lawrence J. Crowley Jr., Riemer & Braunstein, Boston, Mass., for U.S. Trust Co.

Melvin D. Cohen, Brockton, Mass., for Ganniff Const. and William J. McKeone Jr.

## MEMORANDUM AND ORDERS ON MOTIONS FOR SUMMARY JUDGMENT

McNAUGHT, District Judge.

### The Parties

The parties are the *United States of America,* plaintiff, who alleges that through the Small Business Administration ("SBA") it "made an advance payment" in the amount of Fifty Thousand Dollars to a joint venture (the Torres/Ganniff Joint Venture, hereinafter referred to as the "JV"), *Torres Construction Company, Inc.,* and *Ganniff Construction Co., Inc.,* (participants in the joint venture, referred to as "Torres" and "Ganniff"), and the *United States Trust Company* ("US Trust"), escrow agent for the advance, which was intended to be held as security for a bond of the American Fidelity Fire Insurance Company.

### The Theories of Liability

Plaintiff seeks to recover from Torres and Ganniff for "failure to repay an advance payment" and from US Trust for (1) violation of an agreement with SBA (by permitting unauthorized withdrawals), (2) failure to repay escrow funds delivered to US Trust and (3) a violation of chapter 93A of the Massachusetts General Laws.

### The Status of the Action

The plaintiff has moved for summary judgment on all theories against all defendants (Docket Document # 67) based on the pleadings, answers to requests for admissions, exhibits attached to its memorandum (Document # 68), supporting affidavits, a deposition of Carl Hauser, the SBA Chief Disbursement Officer in Washington, D.C., a deposition of Peter Torres, a deposition of William J. McKeone, Jr. and a deposition of Christopher W. Dick.

Torres (Document # 61) and US Trust (Document # 52) have filed similar motions for summary judgment.

What appears on cursory glance to be a simple set of facts and simple issue becomes, on close inspection, very complicated.

### Discussion

In August of 1977 Ganniff and Torres entered into a joint venture Agreement. The following month the JV contracted with the SBA to renovate a part of the Veterans Administration Hospital in West Haven, Connecticut. When the JV sought a bond, it was informed by the surety that $50,000 would have to be put in escrow (the deductible on the bond to be issued by American Fidelity Fire Insurance). The SBA (in accordance with a November 1977 Modification Agreement between JV and the SBA) agreed to put up the money, since JV did not have the cash. This agreement provided for an advance payment to JV— actually a disbursement to a bank (here US Trust)—to be kept in an escrow account. An escrow agreement was entered into between JV, American Fidelity Fire Insurance and US Trust (Exh. A attached to affidavit of Christopher Wallace Dick, Document # 64) Interestingly, the copy with the court was not dated. On November 16, 1977, William J. King of US Trust sent a letter which read in part: "We have today established an escrow account in the name of Torres/Ganniff Joint Venture and American Fidelity Fire Insurance Company. We hold in that account $50,000 as agreed to in the escrow agreement". Account No. 64–934–05 was designated: "the Escrow Account" (Affidavit, C.W. Dick, page 2, Document # 64). There were two additional accounts in the name of JV, a "Special Bank Account" No. 64–649–05 (which had originally been designated as the number to be assigned to the escrow account) and

an "Operating Account" bearing the number 54–999–50.

There is no question that funds were *deposited* as security for the bond. Who funded that account? If it was not originally funded by SBA, did SBA send the money to replace the original fund? And what became of the $50,000, whoever deposited or replaced it?

The SBA says that it provided the money to US Trust. US Trust denies this, and supports its contention with evidence including the Dick affidavit, to the effect that all of the bank's *records*—including the escrow account records, special account records and operating account records—have been searched thoroughly and there is no piece of paper maintained by US Trust which evidences the receipt of money from the SBA in the amount of $50,000. Mr. Dick concludes that "in November, 1977 UST(rust) funded the Escrow Account with a loan of $50,000 to the Joint Venture". He finds support for his conclusion in bank records including a "Credit Comment" (a typewritten note) which reads "TORRES/GANNIFF JOINT VENTURE WJK (the initials of William J. King who authored the letter of November 16, 1977 respecting the establishment of an escrow account numbered 64–934–05) Officer advanced 50m on an unsecured basis for 14 days, for bonding on an SBA contract in West Haven, Conn. The rate is BLR + 2¾". (There follows a date handwritten by someone—11/18/77) He calls the attention of the court also to a "New Account Identification Form" (Exhibit D to his affidavit). This form, strangely, in the "Signature cards" portion, bears the typewritten word "Escrow" where the word "Joint" has been x'd out, but in the "Classification of account" box, it uses the description "Corp. Checking". Something appears to be amiss. The source of the $50,000 is given as "Loan Proceeds".

There are two "Credit Memos"—one pertaining to $50,000 (from note due Nov. 30, 1977) and one in the amount of $44.81. Charges were made to the account:

$303.78 on December 21, 1977 (past due interest on note)

$250.00 on December 21, 1977 (a charge on the note)

US Trust admits that there is a document dated March 29, 1978 (referred to by plaintiff as an "adjunct agreement"). That document refers to the escrow account as No. 64–934–05 and US Trust (page 9 of its Memorandum in opposition to plaintiff's motion and in support of its own) concedes that "The evidence shows that the parties to the 'adjunct agreement' understood the reference to the $50,000 as referring to a sum which was believed by the parties to have been deposited in said account by the SBA." "The purpose of the agreement was to confer upon the SBA rights in and to a fund of $50,000" in that it provided specifically that the money was the sole *property* of SBA and was to be released only to SBA. Despite that document, it appears that in the fall of 1978 escrow funds were withdrawn without the knowledge or consent of SBA. US Trust insists, however, that SBA never forwarded $50,000 to the bank into either the escrow or special account; hence, (it is argued) SBA is not entitled to any "damages" for breach of the March 29, 1978 "adjunct agreement".

There is a copy of a check dated December 1, 1977 in the amount of $50,000. The existence of this copy is acknowledged by US Trust but, says the bank, that check was never *paid* and hence could not have been effective as a transfer of the funds represented by it. It should be noted that SBA referred to the account in question as No. 64–649–05. That is because the account was set up in anticipation of the receipt of money from the SBA under an "Agreement for Special Bank Account dated November 8, 1977 between US Trust, SBA and JV. The confusion in numbers need not stand in the way of resolution of the important issues. SBA expected the funds to be placed in an account with that number, as appears below.

There can be no doubt that, at one time, regardless of source, there was $50,000 in the escrow account. In no submission to the court does US Trust tell where that money went. At one time it was in account

numbered 64–934–05. It was or should have been understood in March of 1978 that the funds belonged to SBA, or were claimed to be SBA's, and yet in June of 1981, Mr. Dick, in a letter to SBA said that US Trust had complied with the Agreement as to account numbered 64–649–05, and he was of the impression that the funds in 64–934–05 were not subject to claim by the SBA.

■ The plaintiff urges upon the court evidence backing its contentions: that Treasury did in fact issue a check, that US Trust received that document and placed the funds in a differently numbered account than the one in which it had agreed they would be placed, that US Trust disposed of the $50,000 without authority and now refuses to give to anyone information as to what happened. SBA insists, and the court accepts the argument, that the failure to explain the release of these funds without written authorization (the account numbered 64–934–05 having been debited twice in October of 1978, once for $30,000 and then for $19,000) prior to receipt of authorization not only reflects poorly on the conduct of US Trust but gives rise to an inference adverse to the defendant bank.

The court finds on the undisputed facts that the SBA agreed to put up $50,000 to satisfy the JV's surety because JV didn't have the money. The JV, through Mr. Torres, asked for this "advance payment" to the JV. If the check issued and was paid, JV received an "advance" of $50,000. On the other hand the money itself was put up for the benefit of JV. It was not transferred to it because, as plaintiff says, under the arrangement, funds could be disbursed only on authorization of the plaintiff.

Secondly, I conclude that Treasury, for SBA, sent $50,000 to US Trust. There is no dispute that an escrow account was arranged for and set up and, on the evidence available, one is driven to infer that US Trust got the money. It was agreed that the account number was to be 64–649–05. SBA in November of 1977 authorized the $50,000 payment to US Trust. On the

25th of that month the authorization was issued by SBA Regional Director Stanley Weinberg, Jr. who used a "Standard Form 1034"—a public voucher form. Carl Hauser, SBA Chief Disbursement Officer in Washington, signed the Form 1034 and his office prepared a Form 1166. Now business custom (see F.R.Evid.R. 406) enters the picture. It is routine for Treasury to issue a check based on these forms. Form 1166 is then sent back to SBA for use in preparing a ledger card. That card was, as a matter of fact, prepared in this instance and is attached to Mr. Hauser's deposition. The Form 1166 itself is not available (probably destroyed after being kept for six years). Since such is routine, there is no adverse inference to be drawn against SBA. Next, it is routine practice that when Treasury issues a check, it sends along with it a carbon of Form 1034. US Trust, in this case, received the carbon of Form 1034, and put it in the JV credit file, according to Mr. Dick. I infer that on these undisputed facts if US Trust got the copy of the form it also got the check.

Problem: The Treasury check itself is not available, it too probably having been destroyed routinely after a retention period expired. Regrettable, but understandable. Treasury (deposition of Joan L. Pesata) says that the check must have been *paid*. There is a copy of the face of a Treasury check numbered 3,898,848, payable to US Trust, escrow agent for Torres/Ganniff Joint Venture. There is, regrettably again, no copy of its reverse side. When a check has been paid, according to banking practice, an imprint is encoded on the face of the check. The copy of the face of the check (which was dated December 16, 1977) does not have an encoded imprint, but this is not a surprising fact, if the copy was made prior to the mailing of the original, as indeed it must have been. Was the check paid? I conclude that it was, and that the funds were therefore transferred to US Trust. There is the Pesata affidavit and more to require the conclusion.

Before the arrival of the check, US Trust made a short term loan of $50,000, and put it into account 64–934–05 (rather than 64–

649–05, as agreed). This was on November 16, 1977. I note that interest was charged on this loan until December 21, 1977 but not thereafter. Why? Because the loan was paid off at that time, by the arrival of the Treasury check and its payment. The face of the Treasury check is dated December 16th, and the bank's records show receipt of the copy of the Form 1034 on *December 20th.* If the check was paid that day, the bank would use the $50,000 to satisfy the short term loan, and would charge interest no longer. If the check was not received and paid, the bank would have kept on charging interest. US Trust, as contended by plaintiff, used the Treasury funds to pay itself off. No other reasonable explanation has been offered. This should have been reflected on Account No. 64–934–05. The check was paid, and at that time, US Trust became accountable for proper disposition of the funds. Defendant US Trust, however, breached its duty, as spelled out in the March 29, 1978 document, in October of 1978 when the unauthorized withdrawals were made. These were reflected in a bank statement sent to the JV's office in Norwood, Massachusetts, dated October 20, 1978.

■ This last date, October 20, 1978 assumes importance since the defendant US Trust seeks summary judgment, and one of its bowstrings is a claim that the plaintiff failed to file within the six year statute of limitations applicable to contract claims. At the earliest, the cause of action accrued on October 20, 1978 and the complaint was filed October 19, 1984—on time by at least one day. Of course, as plaintiff argues, SBA could not have known of the breach for some time thereafter; hence, the statute did not begin to run until after October 20, 1978.

The conclusion that plaintiff is entitled to prevail is fortified by events that occurred subsequently to the date of breach. The project work was completed in March of 1979, and SBA then asked that the funds be paid to it. Letters were sent on September 12, 1979, October 22, 1979 and January 16, 1980 requesting the funds be given back, without any response. Lawyers for the surety wrote to the US Trust on January 7, 1980 asking the bank to confirm the availability of the fund—without response. According to Mr. McKeone, a Ganniff owner, an executive vice-president of the bank, Daniel Ciotti, "pressured" him into signing an indemnification agreement containing a statement that the funds had been released to Ganniff. McKeone says that no such transfer occurred, and apparently US Trust has no records (other than the indemnification agreement) to show such a transfer. US Trust sent SBA a check in the amount of $4,113.16, which was returned by SBA. Subsequent letters (January 8, 1981 and June 9, 1981) were followed by the letter from Mr. Dick (referred to above) in which he said it was his impression that the SBA had no claim on the funds in the 64–649–05 account. The surety's attempts to obtain a response from US Trust are recited in the plaintiff's memorandum in support of its motion. They need not be recounted here. The dealings of US Trust with SBA subsequent to the breach are worthy of consideration in the light of the statement of a claim under chapter 93A of the Massachusetts General Laws, which outlaws deceptive business practices, and raises the possibility of the award of double or treble damages.

■ The United States has actually been damaged to the tune of $50,000, which it certainly is entitled to recover on this motion for summary judgment. Although certain original records of plaintiff have not been produced, it appears that they were destroyed in good faith under a routine policy to do away with such records after the expiration of a retention period. Under the Best Evidence Rule, secondary evidence is admissible to establish the contents of the originals, and there are no "degrees of secondary evidence". Indeed, in this case, the records which were kept by US Trust buttress the conclusion that it received the money from the plaintiff, then failed to account for it properly. When it stopped charging interest on the short term loan, it made an admission by conduct that the $50,000 loan had been paid off by the SBA.

Judgment will enter in favor of the plaintiff as against the defendant United States Trust Company in the amount of $50,000 with interest and costs on the counts (Counts I and II) based upon (1) permitting unauthorized withdrawals from the escrow account in violation of agreements, and (2) failure to repay the escrow funds. Those funds which were deposited in escrow were the sole property of SBA, and the money was to be disbursed only to the SBA or at its order. The bank, however, without authority, released the funds.

There remains to be considered the question whether plaintiff should recover on that count (Count III) based upon an alleged violation of chapter 93A of the General Laws of Massachusetts. Section 11 of that chapter provides that "any person who engages in any trade or commerce" who suffers a loss of money as a result of the "use or employment" "by another person" engaged in trade or commerce of an unfair or deceptive act or practice (declared unlawful by section two), may bring an action for damages. If defendant's violation is willful and knowing, it is liable for not less than double nor more than treble damages.

■ US Trust advances the proposition that the plaintiff lacks standing to maintain an action for violation of the Consumer Protection Act of Massachusetts, citing *United States v. Roche*, 425 F.Supp. 743, 745 (D.Mass.1977). Roche, however, is a case distinguishable on its facts from the case at bar. There was nothing, on the facts of Roche, which indicated that the United States was engaged in trade in any fashion. The government there claimed that defendant was using the mails to further a scheme. No economic interest of the United States was at stake. It sought to act in parens patriae. Here, the United States, on behalf of the SBA, complains that its money has been mishandled, and that such mishandling constitutes a breach of contract. This case involves a business relationship between plaintiff and the defendant bank. Here, the plaintiff is a "person" since section 1(a) of chapter 93A defines the word "person" to include "any other legal entity". The United States and the Small Business Administration are legal entities. Judge Young of this Court recently (January 27, 1986) had occasion to consider whether a public body was a "person" and could be a proper defendant within the meaning of chapter 93A. He answered the question in the affirmative, while noting that neither the Massachusetts Supreme Judicial Court nor the Massachusetts Appeals Court had addressed the question directly. Two Justices of the Superior Court, he said, had reached different conclusions. *Pierce, Jr., Secretary of Housing and Urban Development v. Dew*, 626 F.Supp. 386 (D.Mass.1986). I see no reason why a public body may not have the advantage of the provisions of the Consumer Protection Statute as a plaintiff. In the absence of a decision to the contrary by the Massachusetts courts, it seems to me that defendants in cases involving trade and commerce should not escape liability for unfair conduct when dealing with public bodies. The statute has been described as one of "broad impact" in *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 322 N.E.2d 768 (1975).

■ I conclude also that the conduct of US Trust was knowingly and willfully unfair. Its adamant behaviour in failing to answer communications of the plaintiff with respect to the funds, its refusal to recognize the import of its own action in making no interest charge upon receipt of the check and the copy of the Form 1034, its refusal to give an accounting of the money which had been disbursed to someone, merit judgment in the form of treble damages. This is entirely apart from the creation of the indemnification agreement, which certainly could be described as the "capper" of its activity. The plaintiff is correct in describing US Trust's behaviour as intentional disregard of a fiduciary duty. Judgment on Count III shall provide for three times the actual damages of $50,000, reasonable attorneys' fees and costs. A separate hearing shall be held with respect to the award of appropriate attorneys' fees. The motion of United States Trust Company for summary judgment in its favor is denied.

The plaintiff asks also for summary judgment against Torres, Ganniff, and the Joint Venture in Docket # 67, while Torres asks for judgment in its favor, in Document # 61. The SBA reminds us that it contracted with the Joint Venture (Subcontract Number BS1218(a)–77–C–169), and when the JV did not have the $50,000 available to put in the escrow account, the SBA advanced the money at the request of JV. Torres, in the body of its motion, argues that SBA has not been able to provide "conclusive evidence, such as a check or wire transfer" that it funded the account. Says Torres: "The Bank claims that *it* may have funded the account with a short term temporary loan, that was never repaid." That issue has been determined by the court as recited above. It was SBA who provided the $50,000 to replace the $50,000 put up by way of a short term loan, and it was the bank who failed to retain that money until its release was demanded by the SBA.

It appears to be beyond dispute that, on the evidence available, neither Torres nor Ganniff nor the JV ever had access to the account. Torres stated in his deposition that at no time did he or his firm ever see a check for $50,000; therefore, it is contended, he cannot be held liable, nor can his firm.

What was called "an advance payment" in the amount of $50,000 was made by the SBA by reason of the Agreement dated November 8, 1977 between US Trust, SBA and the JV. "An advance payment is a disbursement of funds to a bank for a specific small business concern, which funds are to be held in a special bank account and are to be repaid to SBA. SBA does not charge interest on advance payments." Plaintiff's Memorandum, fn 3, page 2. Note that neither Ganniff nor Torres signed that agreement. The JV was a party to it. The money which should have remained in the account was deposited, but it is gone, without fault on the part of the JV, Ganniff or Torres. Should they be held liable nonetheless? The plaintiff asserts that the answer must be "Yes", since the modification or amendment to the contract on November 10, 1977 provided that SBA would advance the money to the JV and that the JV would return it. This failure to return the money on the part of the JV is labelled by plaintiff as a "breach of contract" for which JV is liable, and Torres and Ganniff are claimed to be liable as joint venturers. "(T)heir liability is based on their failure to repay funds placed in the USTC bank account for their benefit". Plaintiff's Memorandum, page 16. And, at page 17 plaintiff contends that "The ultimate fate of the funds, whether lost, stolen or otherwise improperly handled by them or by the USTC, does not alter their contractual liability to repay the advance".

■ For the JV to be able to satisfy the surety, $50,000 had to be put up. Equivalently the SBA said "We'll put up the $50,-000 (without which you cannot do the subcontracting work) but you are guaranteeing its return. This is just like our lending you the money and not charging interest on the loan. If somebody else makes off with it, you are liable to SBA". Such was the agreement, and the JV and the members of it are indeed liable to the plaintiff for breach of contract—failure to repay funds placed in an account for their benefit. The plaintiff is entitled to judgment as against the Joint Venture and the members of it jointly and severally in the amount of $50,-000 with interest and costs. On this score, however, the date from which interest should run is in doubt. The plaintiff and the defendants, other than US Trust, are granted 30 days within which to submit memoranda, advising the court of their views as to the manner in which interest should be computed. Each should submit a proposed form of judgment.

## JUDGMENT

Judgment is hereby entered for the United States, which shall recover as follows:

1. $50,000.00 from the United States Trust Company on Counts I and II of the complaint, with prejudgment interest at 12% per annum from October 4, 1978 to the date of judgment and postjudgment inter-

est at 5.77%, compounded daily from the date of judgment until paid.

2. $150,000.00 from the United States Trust Company on Count III of the complaint, with prejudgment interest on $50,000.00 at 12% per annum from September 12, 1979 to the date of judgment and postjudgment interest on $150,000.00 at 5.77%, compounded daily from the date of judgment until paid.

3. $50,000.00 from the Torres/Ganniff Joint Venture, the Torres Construction Co., Inc. and the Ganniff Construction Co., Inc., jointly and severally, on Count IV of the complaint, with prejudgment interest at 12% per annum from April 23, 1981 to date of judgment and postjudgment interest at 5.77% compounded daily from the date of judgment until paid.

4. Costs of $917.21.