**B & R REALTY COMPANY, Plaintiff,**

v.

**SPRINGFIELD REDEVELOPMENT AUTHORITY and The City of Springfield, Defendants.**

**Civ. A. No. 87–0143–F.**

United States District Court, D. Massachusetts.

March 16, 1989.

David P. Grossi, Barry A. Bachrach, Bowditch & Dewey, Worcester, Mass., James G. Green, Jr., Ann F. Bird, Pepe & Hazard, Hartford, Conn., for B & R Realty Co.

William F. Howard, III, Springfield, Mass., for Springfield Redevelopment.

Harry P. Carroll, Deputy City Sol., Richard T. Egan, City Sol., Springfield, Mass., for City of Springfield.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

The City of Springfield, Massachusetts—one of two defendants—moved for summary judgment. This Court referred the motion to a United States magistrate pursuant to 28 U.S.C. § 636(b)(1)(B). On December

---

13, 1988, the Magistrate issued a report recommending that this Court grant the City's motion on all counts. Now before the Court are plaintiff B & R Realty's written objections to the Report and Recommendation and the City's opposition thereto. Defendant Springfield Redevelopment Authority has not taken a position on this matter.

## I. FACTS

Neither party to the summary judgment motion objects to the Magistrate's factual findings. Accordingly, those findings and the Magistrate's introductory statements are adopted and repeated as follows.

In this diversity action, plaintiff B & R Realty Company ("B & R") is a Connecticut general partnership. The defendants are the Springfield Redevelopment Authority ("SRA"), a corporation organized under the general laws of the Commonwealth of Massachusetts to carry out urban renewal activities and the City of Springfield ("City"), a municipal corporation organized under the general laws of the Commonwealth of Massachusetts.

The plaintiff B & R brought this action against the City and the SRA alleging breach of contract, breach of fiduciary duty, unjust enrichment and violation of Mass.Gen.Laws, ch. 93A.

Currently before the court is the defendant City's Motion for Summary Judgment. For the reasons set forth below, this court will recommend that the defendant's motion be allowed.

. . . .

B & R was formed in 1985 with the express purpose of becoming involved in the purchase of certain property, known as the "Easco" property, located in the north end of Springfield. According to the plaintiff, during August of 1985, Frank Gulluni, Springfield's Regional Administrator for Employment and Training, contacted representatives of Raymond Roncari, a general partner of B & R. Gulluni conveyed that the City was interested in including the Easco property in its urban renewal effort. He solicited the help of B & R in order to avoid the sale of the property for scrap and warehouse space. The City wanted it for an industrial park.

According to the plaintiffs Gulluni explained to Roncari that the City was unable to purchase the Easco property for the $1.1 million price offering due to the short time frame involved. Delay would result in loss of the opportunity.

Gulluni proposed that Roncari purchase the Easco property and develop it in a manner consistent with the City's urban renewal goals. According to Lawrence Perl, consultant to and representative of B & R, Roncari on behalf of B & R was interested, but unwilling to accept all the risks of taking title to the Easco property without first having the time necessary to investigate the title and the potential for latent environmental liability.

During September 1985 Perl, for B & R, negotiated a variation on the proposed transaction with Gulluni. B & R agreed to loan $1.1 million in cash to the City for the purchase of the property. B & R would have an option to purchase the Easco property from the City on or before February 1, 1986. Additionally, according to the plaintiff, the agreement included a provision that the City would repay B & R all expenses incurred for the project in addition to principal and interest if B & R did not exercise the option.

Following the preparation of a draft agreement between B & R and the City of Springfield, B & R learned that the [SRA], not the City itself, would be taking title to the property and executing the contract. B & R subsequently sought written confirmation from the City that it "stood behind the agreements that had been reached between it and B & R."

Following on this, in September, 1985 B & R received a letter from the mayor of the City of Springfield indicating that "[t]he actions taken and commitments entered into by the Authority [SRA] for the purpose and subsequent sale and leasing of the [Easco] property has been done with the full knowledge and com-

plete approval of this office." The mayor's letter went on to "clarify ... the relationship between the SRA and the City of Springfield...." According to the mayor, "the SRA functions as a contractor and agent for the City in the carrying out of all approved renewal activities." "The City supports fully the renewal activities of the SRA and provides required financial support to insure the Authority achieves its renewal goals, which emanate from those objectives of renewal established by the mayor."

Additionally, in response to B & R seeking further guarantees, the mayor sent another letter to B & R on October 2, 1985, stating that "the City of Springfield guarantees the return of $1.1 million to [B & R] should, within the time frame established subsequent to our purchase of the Easco property, your group decide not to purchase the properties from the City of Springfield and the SRA."

The SRA purchased the Easco property in October 1985 with the $1.1 million provided by B & R.

According to the plaintiff, its agreement with the SRA required the SRA to perform environmental site assessments and to market the property in accordance with the urban renewal goals to obtain leases on behalf of B & R. According to Perl, following SRA's purchase of the Easco property, B & R, through Perl, kept in contact with Gulluni and an administrative assistant to the mayor concerning the progress of the environmental and marketing provisions in the agreement.

In December 1985 B & R entered into a second agreement with the SRA known as the option agreement. The option to purchase was eventually extended from February 1 to February 20, 1986 primarily, the plaintiff alleges, because "the City never provided the environmental impact studies that had been promised...."

Plaintiff alleges that "[i]n the end of February 1986, the City had not yet accomplished the duties it had agreed to perform." "As a consequence, B & R was forced to again request an extension of the option period so that these materials could be obtained and provided."

A meeting was held to discuss a further extension of the option agreement and

[D]uring the meeting B & R was advised that the City had determined that it would not extend the option period unless B & R agreed to cut the City in on a percentage of the profits to be made from the Easco development. This was contrary to the agreement that had been reached with the City and to further understandings that had been reached during the course of the past several months in oral and written communications with City representatives. B & R rejected the City's blackmail attempt and refused to agree to pay the City a percentage of the profits from the development. As a consequence of the City's actions and inactions, B & R was unable to exercise the option.

On April 7, 1986 B & R wrote to the SRA and the City asking for "return of loan, interest and miscellaneous expenses related to the purchase option of the Easco properties." According to the letter, the total amount due was $1,290,-786.69. This included the initial $1.1 million loan, $65,286.69 in interest due and $125,500.00 in "project expenses."

On May 20, 1986 Dominick Sarno, Executive Director of the SRA, sent B & R payment in full of the $1.1 million loan plus accrued interest of $65,286.69. A dispute arose regarding the validity of the $125,500 claimed project expenses.

The plaintiff, by way of this action, seeks damages both for the claimed "project expenses" and for lost profits allegedly suffered by B & R.

B & R alleges that the City of Springfield as well as the SRA, is liable to them for the monetary damages incurred. The City, in its Motion for Summary Judgment now before the court, argues that no valid enforceable contract existed between the City and B & R. The SRA has not moved for summary judgment.

Magistrate's December 13, 1988 Report and Recommendation at 1, 4–9 (citations omitted).

Based on these facts, the Magistrate concluded that since the City did not sign any contract promising to guarantee SRA's promise to pay B & R project expenses and because no other legal theory asserted by B & R supported holding the City liable for these expenses, the City should be dismissed from the suit. From this ruling, plaintiff objects.

## II. PLAINTIFF'S OBJECTIONS

A. *Applicability of Mass.Gen.Laws ch. 43, § 29 and Section 4.08.010 of the General Ordinances of the City of Springfield*

■ Plaintiff first objects to the Magistrate's finding that Mass.Gen.Laws ch. 43, § 29 (hereinafter "section 29" or "the statute") governs B & R's dispute with the City. The statute reads:

A. All contracts made by any department, board or commission where the amount involved is two thousand dollars or more shall be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor ... and also of the officer or the head of the department or of the chairman of the board, as the case may be, making the contract is affixed thereto.

After thoroughly analyzing B & R's present arguments, this Court agrees that section 29 is inapplicable. It is important for an understanding of this conclusion to put the parties' dispute into perspective.

There are two purported contracts at issue in this case. The first is the express written contract between B & R and SRA. In essence, the terms of this contract are that SRA promised to repay B & R the loan, interest on that loan and reasonable project-related expenses if B & R decided not to exercise the option contract by buying the Easco property from SRA. This contract was not signed by the City although there are letters in the record wherein the Mayor of the City wrote that the City stood behind the SRA.

The second contract is an oral one allegedly between B & R and the City. Although nowhere asserted, B & R apparently claims that the City, acting directly through the Mayor, agreed to guarantee SRA's obligations to B & R.[1]

---

**1.** Nowhere in the record does plaintiff come out and admit that the contract it allegedly made with the City was oral. Instead, plaintiff has repeatedly avoided the City's attempt to have B & R definitively characterize the contract it had with the City. For example, during discovery, the City sent the following interrogatory to B & R:

Identify each agreement between the City and plaintiff which plaintiff alleges was breached by the City and as to each such agreement: describe what action of the City authorized each such agreement and identify all documents plaintiff contends authorized each such agreement.

B & R responded to this interrogatory as follows:

The City breached its agreements with plaintiff as reflected in the Memorandum Agreement dated September 13, 1985 ("Memorandum Agreement"), the Option Agreement dated December, 1985 ("Option Agreement"), the Agreement to Extend Option Agreement, dated January 31, 1986 ("Extension Agreement") and the understandings reached by the parties through their course of dealing and performance. These agreements were undertaken by the Springfield Redevelopment Authority ("SRA"), on behalf of itself and acting as agent for the City ... with the full knowledge, consent and support of the City, including certain financial assurances of the City. The *North End Industrial Park Urban Renewal Project, May 1983,* was authorized by the Springfield City Council on June 27, 1983, thus making the Easco Properties an approved urban renewal project. These Agreements were authorized by the City as reflected in a letter dated September 20, 1985 from the Honorable Richard E. Neal, Mayor of the City ... to the "Birken/Roncari Development Group," and a letter dated October 2, 1985 from the Honorable Richard E. Neal to the "Birken/Roncari Development Corp." The entire course of dealing and performance was conducted with high level officials of the City and the SRA. Also see the letter dated October 2, 1986 from the Honorable Richard E. Neal to the "B & K [sic] Realty Group."

It is not clear from this answer, or from anything else in the record, whether B & R is attempting to hold the City liable on the B & R–SRA express written contract, or on an oral contract supposedly created by the Mayor's written and oral assurances that it would guarantee SRA's obligations to B & R.

With respect to the present issue, only the second contract is relevant. A plausible argument could have been made by the plaintiff to the effect that SRA—because of its close relationship with the City—is a "department, board or commission" of the City and, therefore, the City is bound by SRA's action. Although plaintiff apparently sought to pursue this argument earlier in the litigation—evidenced by the interrogatory answer set forth in footnote one—B & R now abandons this contention, perhaps because of its blatant futility. It is clear that section 29 shields the City from liability on the B & R–SRA contract due to the absence of the Mayor's signature thereon. The statute requires all contracts over $2,000 made by any department, board or commission to be signed by the mayor. It is undisputed that the Mayor did not sign the B & R–SRA contract. *See Ungerer v. Smith*, 765 F.2d 264, 265 (1st Cir.1985) (purpose of Mass.Gen.Laws ch. 43, § 29 is to give mayor control over contracts made by city departments, board and commissions by requiring his signature thereon). Because nowhere in its objections does B & R claim that the City is liable based on the B & R–SRA contract, the statute is not pertinent.

B & R contends, however, that the City is liable for the project expenses due to the Mayor's power to enter into the type of agreement at issue here, presumably the second contract mentioned above. Mass. Gen.Laws ch. 121B, § 23(j) states:

[A] city or town, or the appropriate board or officer thereof on behalf of such city or town, may upon such terms, and with or without consideration, do or agree to do any or all of the following things, as such city, town, board or officer, as the case may be, may determine:—

. . . .

(j) Do any and all other things necessary or convenient to aid and cooperate in the planning, construction or operation of a housing, clearance, relocation or urban renewal project within its limits.

Yet, this broad power is tempered by a Springfield City Ordinance which provides:

In all cases where the amount of any contract made with the city ... which shall exceed one thousand dollars ($1,000), the contract shall be in writing, shall be approved by the city auditor as to available appropriation, and shall be signed by the mayor and a majority of the committee, commission or board, in charge of the work on the part of the city, and after being signed by the parties, no such contract shall be altered in any particular unless a majority of such committee, commission or board shall signify their assent thereto in writing, under their respective signatures, indorsed on such contract, and approved by the mayor.

Section 4.08.010 of the General Ordinances of Springfield.

The First Circuit has written, in a case with which this Court is quite familiar, "the broadest possible general powers in a mayor to contract cannot override a specific statutory assignment of authority to another department." *See Ungerer v. Smith*, 765 F.2d at 266 (citing *Fiske v. Worcester*, 219 Mass. 428, 429–30, 106 N.E. 1025 (1914)). The above-quoted ordinance limits the Mayor's power to contract in Springfield. As the Magistrate found, the Ordinance requires *all* City contracts over $1,000 to be 1) in writing; 2) signed by the Mayor and the majority of the commission, board or department in charge of the work; and 3) approved by the City Auditor as to available appropriation. Unfortunately for plaintiff, these requirements were not satisfied.

B & R maintains that the Ordinance is not applicable to this case because the City's agreement

[D]id not require an appropriation. Instead, the City agreed, by and through its mayor, to purchase the property for the development with B & R's money and, later, to guarantee the SRA's promises to B & R to perform certain duties. Because the agreement was not one to expend monies and did not require an appropriation, there was no necessity of approval by the City auditor or other compliance with section 4.08.010.

B & R's Objections to Magistrate's Report and Recommendation at 3. This clever argument—clearly crafted in a manner so as to avoid application of the ordinance—fails when subjected to close analysis. The "certain duties" of SRA supposedly guaranteed by the City to B & R were to pay B & R the property's purchase price, interest, and project-related expenses. While this guarantee was only a contingency—to be triggered by B & R's decision not to buy the property—such a contingency was quite foreseeable and would necessitate a massive expenditure by the City out of its fiscal coffers. The Ordinance is designed to force all City contracts over $1,000, requiring the expenditure of the taxpayers' monies, to go through a series of checks to insure the City's ability to afford the contract. The purported contract at issue between the Mayor and B & R falls within the ambit of the Ordinance regardless of its conditional nature. *See Ungerer v. Smith*, 765 F.2d at 265–68 (mayor lacked power to agree to assist contractor in building shopping mall due to ordinance requiring city council's approval).

It is widely accepted in Massachusetts that those contracting with a municipality bear the burden of making sure that all statutes and ordinances are obeyed. *See Kimball Co. v. City of Medford*, 340 Mass. 727, 729, 166 N.E.2d 708 (1960) (one dealing with city cannot recover on contract if city's charter not complied with); *Adalian Brothers, Inc. v. City of Boston*, 323 Mass. 629, 631–32, 84 N.E.2d 35 (1949) (mayor's oral contract to purchase goods unenforceable for failure to comply with ordinance requiring mayor's signature); *City of Lawrence v. Stratton*, 312 Mass. 517, 522, 45 N.E.2d 460 (1942) (city's deed of real estate void due to violation of city charter requiring authorization by city council). This proposition has become widely accepted elsewhere. Indeed, one source on the subject of municipal corporations states:

> It is generally held that those dealing with the officers or agents of a municipal corporation must at their peril see to it that such officers or agents are acting within their authority, the reason for the distinction being that in the case of private parties the actual extent of authority is known only to principal and agent, whereas in the case of a municipal corporation it is a matter of record in the statutes of the state or in the proceedings of the municipal council. The municipal corporation cannot be made liable for breach of contract ... when an official of the corporation has exceeded his power or authority. One who contracts with a city is bound at his peril to know the authority of the officer with whom he contracts to enter into the contract; and a contract unlawfully entered into, though in good faith, creates no liability on the part of the city to pay for it....

56 Am.Jur.2d *Municipal Corporations* § 504 (1971) (footnotes omitted).

For these reasons, the Court holds that while Mass.Gen.Laws ch. 43, § 29 does not render the contract allegedly made by the Mayor unenforceable, the Ordinance was not complied with and thus any agreement between B & R and the Mayor cannot be the basis upon which to sue the City for the $125,500 project-related expenses.[2]

*B. Mayor's Fulfillment of Promises*

Plaintiff next objects to the Magistrate's finding that the Mayor fulfilled his promises to B & R. According to plaintiff, the Mayor's promises—especially the one guaranteeing SRA's performance—were not fulfilled. This argument presupposes the existence of a valid and enforceable contract with the City. As mentioned above, the Ordinance requires that any guarantee by the Mayor of SRA's obligations would have to be in writing and signed by the Mayor. This was not done.

Furthermore, even if the Mayor's September 20 and October 2, 1985 letters to B & R could somehow be considered as enforceable contracts, the only binding commitment made by the Mayor therein was that he guaranteed the City would pay B &

---

**2.** No party has raised the defense provided by Mass.Gen.Laws ch. 259, § 1, the Statute of Frauds, which requires contracts for the sale or interest in land or a promise to answer for the debt, default or misdoings of another to be in writing.

R the purchase price of the property should B & R decide not to buy the property. As the Magistrate stated, it is undisputed that the $1.1 million was returned to plaintiff.

### C. Joint Venture

Paragraphs 34 through 36 of plaintiff's complaint read:

34. Plaintiff and defendants agreed to be joint venturers to acquire, develop and market the Easco Properties for the benefit of each of them and in accordance with the urban renewal goals and objectives of the defendants.

35. By virtue of the joint venture defendants were required to act with the utmost good faith toward the plaintiff and owed plaintiff a fiduciary duty of loyalty, good faith and fair dealing.

36. The misconduct of defendants described above constitutes a breach of the fiduciaries duties which they owed the plaintiff.

In his report, the Magistrate rejected this theory. In so doing, he wrote:

Plaintiff fairs no better with its joined venture argument. First, this argument is simply a back door avenue to avoid the contractual requirements set down by statute and ordinance.... Second, the facts here, even when viewed in the light most favorable to the plaintiff, simply do not satisfy the requirements of a joint venture.... There was never "an agreement by the parties manifesting their intention to associate."

Magistrate's Report and Recommendation at 13–14 (citation omitted). In its objections, plaintiff specifically challenges the Magistrate's implicit holding that a joint venture may not be formed in Massachusetts absent an express written agreement. In its opposition, the City applauds the Magistrate's conclusions and argues, further, that even if an actual writing is not needed, plaintiff has failed to prove any other element necessary to form a joint venture under Massachusetts law.

■ While there is no rigid set of rules for entering into a joint venture in Massachusetts, it is clear that there must be proof that the parties intended to create such a business relationship. *See Shain Investment Co. v. Cohen*, 15 Mass.App. 4, 443 N.E.2d 126, 129 (1982). In determining whether the parties in this case had such an intent, the Magistrate apparently found that the intent must be in writing. After a thorough review on the subject of joint ventures under Massachusetts law, the Court agrees with plaintiff that such agreements may be orally created. The beginning point is *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (1952), wherein the Supreme Judicial Court of Massachusetts wrote "[a]s between the parties, as in the case of a partnership, the relationship of joint adventurers is a matter of intent and arises only when they intend to associate themselves as such." *Id.* at 8, 105 N.E.2d 843 (citing *Edgerly v. Equitable Life Assurance Society*, 287 Mass. 238, 243, 191 N.E. 415 (1934)). Although the court found no partnership or joint venture existed in *Cardullo*, a fair reading of the case indicates that a non-written agreement demonstrating an intent to create a joint venture by two or more people or business entities is sufficient proof of such an arrangement so as to bind the parties. *Id.; see also Kravitz v. Pressman, Frohlich and Frost, Inc.*, 447 F.Supp. 203, 210 (D.Mass.1978).

This view is in accord with the approach taken in other states as well. In an extensive article on the subject, the concept of a joint venture is defined by one source as

[A]n association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking and that each joint venturer shall stand in the relation of principal, as well as agent, as to each of the other coventurers, with an equal right of control of the means employed to carry out the common purpose of the venture.... No specific or formal agreement is required.

*See* 46 Am.Jur.2d *Joint Ventures* §§ 1, 7 (1969) (footnotes omitted).

▇▇▇ Thus, generally speaking, an oral agreement is sufficient to create a joint venture. A joint venture, however, is nothing more than a contract to jointly perform some business-related purpose. As much as plaintiff tries to circumvent it, the City Ordinance discussed above requires all contracts over $1,000 to be in writing and signed by the Mayor notwithstanding the fact that the contract may have been one to enter into a joint venture with plaintiff. So, although joint ventures may be created orally, this general principle is trumped by the Ordinance, rendering the oral agreement alleged by plaintiff unenforceable in an action for breach of contract or a joint venture agreement. In short, the Court agrees with the Magistrate that plaintiff's joint venture argument is simply a "back door avenue to avoid the contractual requirements set down by ... the ordinance."

### D. *Mass.Gen.Laws ch. 93A*

Plaintiff also asserts in its complaint that the City violated Mass.Gen.Laws ch. 93A—the consumer protection statute—through the actions set forth in the complaint. The Magistrate recommended in his report that this Court grant summary judgment for the City on two grounds. First, he said it was "doubtful that a municipality can be a defendant in a 93A action" and second, even if they could, the City's conduct did not reach the level of "rascality" necessary to make a 93A claim. In its objections, plaintiff disagrees with each of these decisions.

The Supreme Judicial Court of Massachusetts has not yet determined whether a municipal corporation like Springfield is a person within the phraseology of chapter 93A. *See United States Leasing Corporation v. City of Chicopee,* 402 Mass. 228, 521 N.E.2d 741, 744 (1988) (expressly declining to answer question whether city is

person within Mass.Gen.Laws ch. 93A). Yet, one of the judges of this Court has adopted the reasoning of two Massachusetts state trial court judges in concluding that a governmental agency may indeed be a person and subject to suit pursuant to Mass.Gen.Laws ch. 93A. *See Pierce v. Dew,* 626 F.Supp. 386, 387–88 (D.Mass. 1986).

This decision is in harmony with the broad remedial purposes of chapter 93A. *See Commonwealth v. DeCotis,* 366 Mass. 234, 316 N.E.2d 748 (1974); *see also United States v. United States Trust Co.,* 660 F.Supp. 1085, 1090 (D.Mass.1986). Moreover, the definitional section of chapter 93A, provides:

(a) "Person" shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and *any other legal entity.* M.G.L. ch. 93A § 1(a) (emphasis added).

For purposes of this case, this Court holds that the City of Springfield is a cognizable legal entity potentially liable under chapter 93A. This conclusion, however, only partially opens the door for plaintiff, for the statute also requires B & R to satisfy the Court that the City was involved in "trade or commerce" and, further, engaged in an "unfair or deceptive act or practice." *See* Mass.Gen.Laws ch. 93A, § 9.[3]

In their briefs, both parties address these issues. B & R predictably argues that the City was engaged in trade or commerce and that its acts regarding B & R were unlawful pursuant to chapter 93A. Defendant, on the other hand, contends the City neither engaged in trade or commerce, nor committed any unlawful act.

After a review of the record, the Court decides that these issues are questions for another day. On May 28, 1988 the Magistrate issued a protective order preventing plaintiff from conducting certain discovery. Plaintiff has persistently complained that the depositions of key players in this case,

---

**3.** Unlike the situation in counts one through three, B & R does not need to prove the existence of a contractual relationship with the City to prevail on count four. All that is apparently required is that the parties acted in a business context. *See Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167, 175–76 (1980).

including the former Mayor of Springfield, are crucial to identifying the level of misconduct as perceived by B & R. Although the Magistrate lifted this Order in a limited manner on December 13, 1988, the present motions were filed before plaintiff had a chance to conduct these depositions. Evidence gleaned from the recent Foley deposition lends support for B & R's position here.

Accordingly, the Court feels it would be premature at this stage to forge ahead and finally decide the chapter 93A issue. Instead, B & R should proceed with discovery, limited of course to the sole count surviving summary judgment. Nothing herein should be read as preventing the City from later renewing their summary judgment motion if the evidence fails to prove plaintiff's claims that defendant was engaged in trade or commerce and committed unfair or deceptive acts.

### III. CONCLUSION

To summarize, after a *de novo* review, the Court ADOPTS the Magistrate's recommmendation and GRANTS defendant City of Springfield's motion for summary judgment on counts one, two and three of the complaint. The Court REJECTS the Magistrate's recommendation and DENIES the City's motion for summary judgment on count four. Discovery shall continue in accordance with this Memorandum and Order.

It is So Ordered.