Fremont-Smith, J.
This case is before the Court on cross motions for summary judgment. Defendant Maguire Group, Inc. (“Maguire") has moved for summary judgment to obtain confirmation of an arbitration award requiring reimbursement by the City of Salem of the unpaid balance of $108,433.50 (principal and interest) for architectural services provided by Maguire to Salem for the construction of a new police station. The City of Salem (“Salem") has moved for summary judgment setting aside the arbitration award. For the reasons stated below, I allow Maguire’s motion and deny Salem’s.
I. FINDINGS OF FACT
The following facts are not in dispute:
In response to an advertised Request For Proposals for planning and design services for a new police facility, Maguire and twenty-three other competing design firms submitted proposals to the City by the October 15, 1986 deadline for bids. The competing design firms were advised that the proposals would be evaluated by a Designer Selection Committee, appointed by the City, in accordance with four listed *231 criteria, and were advised that the Designer Selection Committee would select at least three finalists and rank the finalists based on qualifications.
Maguire was selected and was ranked first among the twenty-four competing proposals by Salem’s five-member Designer Selection Committee.
The Salem City Council having been notified of the selection of Maguire as designer, approved, on January 8, 1987, the appropriation of $372,600 to pay for architectural services, soils analysis, and survey work associated with the construction of Salem’s new police facility, and approved the appropriation of $375,000 for the purchase of land on Margin Street as the site of the new police facility.
Thereafter, Maguire and the City entered into a written contract for architect/engineer services for the planned Police Headquarters facility of approximately 22,000 square feet. The contract was executed on behalf of the City by the Mayor and City Planner.
The City Auditor also signed the contract, certifying to the budgetary line item pursuant to which the City Council had appropriated funds for the contract, and the City Solicitor also signed, signifying his approval to the form of the contract.
The contract contained a payment provision which included interest at the rate of one and one-half percent per month on invoices unpaid after sixty days. The contract originally provided for a not-to-exceed fee of $362,600, but that was increased by an additional $34,000 by an Amendment in April 1987. That amendment confirmed an increase in scope of the project to 28,219 square feet, and allocated most of the additional fee to the design. The Amendment was executed with the same formalities and signatures as the original contract. The amended total amount for architect/engineering services was $396,000.
By July 1987, the Salem City Council had approved a Bond Order in the amount of $3,900,000 for construction of the new Margin Street police facility. Maguire proceeded to provide the services, and to bill Salem therefor. The net amount which remains billed and unpaid for such services is $70,651.50 and with interest as of the date of the arbitration award ($37,781.55) totals $108,433.05. Salem does not dispute the reasonable value of the services which Mag-uire provided, or the amount which remains unpaid.
Although the contract contained a provision which permitted Salem to terminate the contract on ten days notice, the last official notice received by Maguire from the City was a January 23, 1990'letter from the Mayor withdrawing an earlier letter of termination.
Because of a change in the political landscape, Salem subsequently decided to build a less costly police station, and scrapped Maguire’s architectural plans. The City then sought an informal letter of opinion from the Office of the Inspector General of the Commonwealth, who opined that Salem had failed to comply with the requirements of c. 7, §32k(a) and the Cily Charter, §36A, so that the contract was void. Salem then refused to pay Maguire for the balance due on the contract, and the matter was submitted to arbitration pursuant to paragraphs 9.1-9.3 of the contract, which provides, in relevant part:
ARBITRATION
9.1 All claims, disputes and other matters in question between the parties to this Agreement, arising out of or relating to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise . . .
9.3 The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.
At the arbitration hearing, Salem objected to the jurisdiction of the American Arbitration Association to hear and resolve the parties’ dispute by way of a Motion to Dismiss. Salem’s motion, which the arbitrators denied, was premised upon the same procedural defects in the contract’s inception which are raised by Salem’s complaint in this action.
As a result of the arbitration proceeding between the parties, the American Arbitration Association rendered an Award on July 3, 1991, which required the City to pay Maguire $108,433.05, consisting of $70,651.50 for architectural services and $37,781.55 in interest.
At all material times, Section 36A of the Salem City Charter contained the following provision:
§36A. Designer selection committee. There shall be a designer selection committee which shall consist of three persons appointed by the mayor subject to confirmation by a majority vote of the city council. The initial appointments shall be for a term of one (1) year, two (2) years, and three (3) years consecutively. All subsequent appointments shall be for a term of three (3) years. In making his appointments to the committee, the mayor shall seek to assure representation from as many of the following areas as is possible: architecture, landscape architecture, construction industry, art and finance. No architect or design consultant shall be engaged by the city for any purpose unless the name of the firm or individual to be engaged shall first be submitted to the designer selection committee and approved by a majority vote of its members.
II. RULINGS OF LAW
This case is difficult in that it falls somewhere between the clearly-defined boundaries of permissible and impermissible conduct of a municipality in entering into a contract for professional services. The Supreme Judicial Court has stated clearly, in Majestic *232 Radiator Enclosure Co., Inc. v. County Commissioners of Middlesex, 397 Mass. 1002, 1003 (1986), thatwhere “there was no posting, advertising, or public invitation to bid or compliance with any other requirement under the public bidding statutes, a public procurement contract created in violation of the competitive bidding statute is invalid and unenforceable” because “the public interest in adherence to statutory bidding procedures overrides any equitable considerations.” In Majestic, the court voided a contract for installation of radiator covers in a public hospital, and prohibited payment therefore, even though the radiator covers were already installed. The Court held that a mutual mistake as to the power of a municipality to contract would not allow recovery, even in quantum meruit, because a “good faith rendering of services in such a situation does not warrant violation of the statutory arrangement.” Id., 1003-04. See also Haffner v. Director of Public Safety of Lawrence, 329 Mass. 709 (1953) (enjoining the carrying out of a contract, not yet performed, for provision of parking meters from an alderman in violation of the conflict of interest laws); Gifford v. Commissioner of Public Health, 328 Mass. 608 (1952) (enjoining execution of a contract which had not been awarded to the lowest bidder); and Ungerer v. Smith, 765 F.2d 264 (1st Cir. 1985) (invalidating the agreement of a Mayor, without City Council approval, to fund a proposed parking garage appurtenant to a shopping center).
On the other hand, where bidding requirements for a public contract were not violated, but a city failed to adhere to other statutory requirements, the Supreme Judicial Court declined to invalidate the contract, in City of Lawrence v. Falzarano, 380 Mass. 18 (1980). There, a contract was signed with the City to perform major renovations to a public hospital, and an adequate appropriation was approved by the City Council. The City, however, had ignored M.G.L.c. 111, §25C, (which requires that no construction of a public health facility be commenced unless a certificate of need has been obtained from the Department of Public Health). After the contractor had performed preparatoiy work and incurred expenses, the certificate of need was sought but was denied by the D.P.H.
An arbitrator concluded that Falzarano should be awarded compensation for his expenses and his lost profit on the contract, and the Court agreed. The Court pointed out that the “determination of need” statute did not specifically declare all contracts made in violation of the statute to be void, but only prohibited any construction without a certificate of need. The Court said, 380 Mass, at 22:
If the statute does not declare a contract made in violation of it to be void, and if it is not necessary to hold the contract void in order to accomplish the purposes of the statute, the inference is that it was intended to be directoiy, and not prohibitory of the contract. . .
The Court further concluded that, “since the contract was valid, the agreement to arbitrate contained in it was binding and enforceable unless revoked.” The Court added: “The facts that this defense [of illegality] may have entitled the city to prevail if the matter were initially tried before a court, or that the arbitrators may have made an error of law in reaching their decision, do not permit a court acting under the limited authority given by c. 251, §12, to vacate or refuse to confirm the arbitration award.” Id., 27.
Like M.G.L.c. 111, M.G.L.c. 7, §38K does not explicitly declare a contract which does not comply with §38 to be “void.” It does, however, mandate that such a contract “shall be awarded only after a selection procedure — complying with the purposes and intent of the statutory procedures (emphasis added).
This language was apparently intended to afford cities and towns some flexibility in the procedures followed in awarding contracts. The closest thing we have to legislative history is the Ward Commission Report, which led to §38’s enactment.
At Volume 7, page 243 of the Ward Commission Report, the following comments appear, which elucidate the context in which Section 38K was enacted.
The Commission recommends that municipalities (cities or towns) use the procedures described here. Smaller municipalities may not have the financial or human resources to accomplish this, or the frequency of capital outlay programs to sustain and justify the necessary institutional framework. A tradition of local autonomy, even in cities of a size to warrant these procedures, makes mandatory use of the [Design Selection Board] unlikely to meet with local acceptance. Municipalities should be able to use the services of the Designer Selection Board to recommend finalists, subject to a fee for DSB staff services. The DSB should prepare a model application form and model procedures for municipalities’ optional use. All municipalities are required, however, to select designers using certain minimum standards to assure selection based on merit.
These include:
1. Advertisement for applications to include a project description, the estimated construction costs, the selection criteria, and either the fee or the method for setting the fee;
2. Adopting written selection procedures before applications are received, providing for equal procedural treatment for all applicants in order to narrow consideration to a smaller group of at least three finalists, and also providing for equal procedural treatment of the three finalists;
3. Ranking of the finalists and a public statement of any vote taken and the reasons for the ranking;
4. Selection of the first ranked or justification for any other selection;
*233 5. Fees stated as a total dollar amount in the contract;
6. Reporting to the public and the state on the selection procedure, the steps taken to comply with it, and the result.
(Id., 243, emphasis added.)
The Ward Commission’s six listed “minimum standards” for local cities and towns were substantially incorporated as the five basic requirements for local designer selection programs set forth in the statute (Section 38K(a)(i)-(v)). Moreover, the Commission’s reference to a “tradition of local autonomy” making impractical the mandatory use of the centralized, state Designer Selection Board “by the cities and towns, elucidates the statutory provision that municipalities shall comply only “with the purposes and intent” of Sections 38A 1 /2 to thirty-eight O, rather than comply strictly with their literal provisions.
In this case, there is no genuine dispute that Mag-uire was ranked first and selected following not only a publicly advertised request for bids, but also interviews and fee negotiations with Salem’s Designer Selection Committee. Furthermore, the Maguire Salem contract was executed with all the appropriate legal formalities, such as execution by the Mayor and certification as to adequate appropriation by the City Council. There was public notice and a competition pursuant to which twenty-three other design firms submitted proposals, and a ranking of finalists. The City Council was notified in writing of the selection of Maguire before it voted to approve an appropriation to fund the Maguire contract. Under these circumstances, it cannot be said that there was any wholesale disregard of the purposes and intent of c. 7, §38 sufficient to void the contract.[1]
The same considerations should apply to the City’s attempt to evade any liability for payment under the parties’ contract on the basis of an alleged violation of Section 36A of the City Charter. While the City argues that the “Ad Hoc” design selection committee appointed by the Mayor which reviewed the bids did not have the same significance as the standing “designer selection committee” appointed by the City Council contemplated by Section 36A, it is undisputed that both the Mayor and the City Council were aware of the committee’s selection of Maguire from competing design proposals and that the Council provided funding for both the Maguire contract and the building project after being notified in writing of Maguire’s selection by the design selection committee.
As stated in Falzarano, supra,
[Cjourts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law.
380 Mass. at 23.
Here, as in that case [where another alleged defect (in addition to the lack of the certificate of need) was the failure to have the City Auditor’s certification on the contract of an available appropriation, as required by c. 44, §31C], the Court’s expression that substance rather than form should control, is applicable. Applying the judicial approach of Falzarano to City Charter Section 36A, 1 conclude that it is both fair and reasonable to view the “Ad Hoc” Designer Selection Committee’s screening and ranking of competing design firms to have constituted substantial compliance with the purpose and intent of Charter Section 36A.
Although, as in Falzarano Salem might have successfully sought rescission of the contract initially, before it accepted Maguire’s performance thereunder and made part payment thereon, I do not find that Salem’s departures from strict compliance with c. 7, §38 and from the Charter §36A were so egregious as to have voided the contract ab initio.
As these questions fell within the broad parameters of the arbitration clause in the contract, which was not ab initio void, no grounds exist for vacation of the award under G.L.c. 251, §12. Falzarano, supra, 380 Mass., at 27.
III. JUDGMENT
Accordingly, Salem’s motion for summary judgment to set aside the arbitration award is denied, and Maguire’s motion for summary judgment is allowed.
Judgment shall enter for Maguire in the amount of the arbitration award, $108,433.05, plus interest from the date of the award (July 3, 1991) and the costs of this action.

 Indeed, a principal objection of the Inspector General was that the competition included a request for bids as to the fees to be charged by the firm providing design services, i.e. that the city required too much, rather than too little, competitive bidding.