Irwin LOFT and Robert Stein,
Plaintiffs, Appellees,

v.

Edward B. LAPIDUS,
Defendant, Appellant.

No. 90–2100.

United States Court of Appeals,
First Circuit.

Heard May 9, 1991.

Decided June 26, 1991.

* Of the District of New Hampshire, sitting by designation.

Kevin M. Brill with whom Corrente & Brill and Marvin A. Brill, Providence, R.I., were on brief for defendant, appellant.

Mark H. Grimm with whom Max Wistow and Wistow & Barylick Inc., were on brief, Providence, R.I., for plaintiffs, appellees.

Before CAMPBELL and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This diversity case arises out of an arrangement between Edward D. Lapidus, a real estate developer, and Irwin Loft and Robert Stein, two investors with whom Lapidus joined to purchase property in Warren, Rhode Island known as "Water's Edge," and to build condominiums on it. Loft, Stein and Lapidus joined forces in this venture, and Lapidus signed a contract for purchase of the property on behalf of all of them. Lapidus never actually took title to the property, however, and Lapidus recovered $140,000 in settlement of a lawsuit he brought under the contract against the seller. At issue in this appeal is whether Loft and Stein, having at one point objected to Lapidus's bringing the lawsuit, are entitled to share in the settlement proceeds. The district court held that they are. We affirm.

In January 1987, Dennis Gray, who owned the property, informed Stein that he was seeking financing for the Water's

Edge condominium development, and Stein then discussed the proposal with his business partner, Loft.[1] In February or March 1988, Stein then interested Lapidus in the venture. The latter was needed for his experience and resources as a developer. After initial discussions, Loft, Stein and Lapidus agreed that they would create a limited partnership to acquire and develop Water's Edge in which Loft and Stein would have a 25% interest and Lapidus would be the general partner with a 75% interest.

Stein testified at trial that he negotiated a purchase price of $7 million for Water's Edge with Gray, and a $225,000 deposit amount, and informed Gray that a New York developer (Lapidus) would be involved in purchasing the property. On April 29, 1988, Lapidus and Gray entered into a Purchase and Sale Agreement for the property, at the $7 million price. While the Purchase and Sale Agreement did not mention a limited partnership, Loft and Stein together contributed $125,000 and Lapidus contributed $100,000 to the $225,000 deposit paid to Gray. A July 1988 letter from Lapidus to Loft and Stein confirmed Lapidus' intent to enter into a Massachusetts limited partnership for purposes of acquiring and developing the property. The letter acknowledged the receipt of $125,000 "as a capital contribution to the limited partnership to be established," and set out the basic terms of the limited partnership agreement, including the 25%–75% division of partnership interests.

After the execution of the Purchase and Sale Agreement, disputes arose. Lapidus was informed that Gray was attempting to sell the property and neglecting to obtain the permits that he agreed to obtain prior to closing, and Lapidus informed Loft and Stein that he intended to sue Gray. In September 1988, Loft and Stein—understanding from Lapidus that the intent of the lawsuit was to cause delay and Gray's bankruptcy, thus lowering the price of the property—protested the tactic and sought to have their $125,000 contribution returned. Lapidus contends he agreed to return the money if Loft and Stein could find someone to assume their position; the money was not returned.

Lapidus then sued Gray under the Purchase and Sale Agreement. Meanwhile, Loft, Stein and Lapidus continued to discuss their business relationship. On October 18, 1988, Loft and Stein, by letter, withdrew their request for return of their $125,000 contribution, and advised Lapidus that, as partners, they wanted to remain apprised of the lawsuit against Gray. The major point of contention remaining was whether Lapidus would assure Loft and Stein that he would take title to the property and develop it once tendered, rather than resell it.

On October 31, 1988, Loft, Stein, Lapidus, and their lawyers met to resolve their differences. Loft and Stein executed their signature lines on Lapidus's July 1988 letter of intent in acceptance of its terms. An additional paragraph was added to the letter below the signature lines (which the parties initialed) providing that in the event a portion of the deposit was returned under the Purchase and Sale Agreement,[2] $25,000 would be retained "for payment of expenses," and the remainder would be distributed 5/9 to Loft and Stein, and 4/9 to Lapidus. Thereafter, Loft and Stein refused to sign a tendered limited partnership agreement because it did not contain Lapidus's assurance that he would take title and develop the property. Loft and Stein contended at trial—and Lapidus denied—that Lapidus orally gave this assurance at the October 31 meeting.

After several abortive attempts to arrange a closing on the property, Loft and Stein brought this action against Lapidus on February 14, 1989, seeking, *inter alia*, specific performance of what they contended was Lapidus's agreement to take title to

---

**1.** Loft and Stein were partners in a real estate investment firm known as "Westwood One."

**2.** The Purchase and Sale Agreement contained a deposit reduction provision requiring Gray to return $125,000, with interest, if Lapidus did not receive a notice of closing within 180 days of the agreement.

the property, as well as "an accounting of any monies obtained with respect to the real estate in question and to pay to Plaintiffs a sum equal to ⅝ of such monies." The next day, Lapidus settled his lawsuit against Gray, receiving $100,000 representing the balance of the return of the deposit[3] and $140,000 in compensation. Thereafter, Gray transferred the Water's Edge property to Fleet National Bank, who, at the time of the trial, was the record title holder.

After a four-day bench trial, the district court refused to grant Loft and Stein's claim for specific performance, "find[ing] as fact that there was no agreement that, come what may, Defendant Lapidus would take title to the Property and build the condominium units." The court also found, however, that "[t]he parties have agreed to every essential point of the limited partnership agreement," save the execution of the formal papers. Reasoning that "it is appropriate to treat the parties as if they had actually done what they ought to have done," the court resolved the rights of the parties as if they were partners in accordance with the terms stated in the letter of intent. The court held that Loft and Stein were entitled to a return of their capital contribution of $125,000, less their portion of fees and expenses incurred. In addition, the court held that Loft and Stein were entitled to a 25% share of the profits of the settlement with Gray, with prejudgment interest.

On appeal, Lapidus contends that the district court erred in awarding Loft and Stein a portion of the settlement proceeds from the Lapidus–Gray lawsuit. Lapidus's principal arguments are as follows: (1) Loft and Stein never finally entered into a partnership agreement with him, but rather only "agreed to agree." (2) Loft and Stein never agreed with him that their partnership interest would extend to proceeds from the lawsuit against Gray. Rather, Lapidus maintains that Loft and Stein opposed the lawsuit, sought only profits from acquisition and development of the property, and declined to address the lawsuit or division of a potential settlement in the letter of intent. (3) Lapidus contends that plaintiffs did not seek a share of the settlement proceeds in their complaint in this case. (4) Lapidus also argues the district court erred in applying a 12% Rhode Island statutory prejudgment interest rate. We find no merit in Lapidus's arguments, and affirm the judgment of the district court.

## I.

Lapidus first contends that Loft and Stein had never entered into a partnership with him, but rather had only "agreed to agree" on the partnership terms. A partnership is a voluntary association to carry on a business for profit based on agreement between the partners, which need not be written. *See* 1 Z. Cavitch, *Business Organizations With Tax Planning,* § 14.01 (1991); 1 A. Bromberg & L. Ribstein, *On Partnership,* § 2.01 (1988); Mass.Gen.Laws Ann. ch. 108A, § 6; R.I. Gen.Laws § 7–12–17.[4] The district court concluded that the parties agreed to every essential point of the limited partnership relationship, finding that "[t]he only step left in solidifying that relationship is the execution of the formal documents themselves."[5] Reviewing this finding for clear error, *Langton v. Johnston,* 928 F.2d 1206, 1218 (1st Cir.1991); *Henry v. Connolly,* 910 F.2d 1000, 1002–03 (1st Cir.1990); Fed. R.Civ. P. 52(a), we find it amply supported

---

**3.** One hundred twenty-five thousand dollars, with interest, had been returned to Lapidus in November 1988 according to the provisions of the Purchase and Sale Agreement. *See supra* note 2.

**4.** Massachusetts and Rhode Island have both adopted the Uniform Partnership Act. Mass.Gen. Laws Ann. ch. 108A, § 6 and R.I.Gen.Laws § 7–12–17, provide: "A partnership is an association of two or more persons to carry on as co-owners a business for profit."

**5.** In contrast to a general partnership, a limited partnership may only be created by compliance with statutory requirements, including the filing of a certificate of limited partnership. *See* Mass.Gen.Laws Ann. ch. 109, § 8; R.I.Gen.Laws § 7–13–8. Nevertheless, failure to comply with the statutory requirements generally does not affect the rights of the partners as between themselves. 2 Z. Cavitch, *Business Organizations,* § 39.05[1] (1991).

in the record. The district court determined, for equitable reasons, to treat Loft, Stein and Lapidus as partners in accordance with their understanding. The district court could equally have concluded that they were actual partners, having found that they had agreed on the terms of their partnership relationship, had jointly furnished the deposit on the Purchase and Sale Agreement, and had otherwise jointly gone ahead as coventurers. *See B & R Realty v. Springfield Redevelopment Authority*, 708 F.Supp. 450, 456 (D.Mass. 1989); *Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 210 (D.Mass. 1978) (partnership contract may be implied based on acts and words evidencing intent); *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843, 845 (1952) (relationship of joint adventurers or partners is a matter of intent).[6]

■ It is uncontested that the parties intended to form a limited partnership for purposes of the acquisition of the Water's Edge property; that Loft and Stein, as limited partners, would have an interest of 25% in the profits; and that Lapidus, as general partner, would have a 75% interest. There was testimony at trial that, at the time of the Purchase and Sale Agreement, Loft, Stein and Lapidus all considered themselves to be in partnership, with their respective powers—as general or limited partners, as well as their respective interests—unambiguously understood. While not expressly signing as a partner, Lapidus plainly entered into the Purchase and Sale Agreement for all three—not for himself alone. Lapidus conceded at trial that he shared ownership of the Purchase and Sale Agreement with Loft and Stein.[7] Loft and Stein contributed ⅝, or $125,000, toward the $225,000 deposit under the Purchase and Sale Agreement. Moreover, according to Lapidus's own testimony at trial, Lapidus discussed the Gray lawsuit with Loft and Stein at the October 31 meeting, and they agreed that $25,000 of the partnership's joint capital would be deducted from the return of deposit, in order to pay the legal expenses in the Lapidus–Gray litigation.[8] This was in fact done. The parties originally conceived that their Water's Edge development venture would be undertaken in partnership; both the deposit under the agreement in furtherance of that venture and the litigation regarding the rights under that agreement were financed with partnership capital. These understandings were memorialized in the October 31 letter of intent. Under these circumstances, we do not hesitate to regard Loft, Stein, and Lapidus as partners.[9]

6. As the purpose of the business relationship in this case was limited in scope to the acquisition and development of the Water's Edge property, it may be that the relationship is better termed a "joint venture" than a partnership. *See Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 623, 550 N.E.2d 127, 133 (1990); *Cardullo* 105 N.E.2d at 845. In any event, the rights of the parties in this case are no different whether their relationship is termed a "partnership" or a "joint venture."

7. Lapidus's testimony was as follows:

THE COURT: So they were sharing ownership with you?

THE WITNESS: Correct, at that point I just assumed that we equally owned the contract.

8. On cross-examination, Lapidus testified as follows:

Q. I'm going to show you [the October 31 letter of intent], third page, paragraph 9. Do you remember that?

A. Yes.

Q. Do you recall a discussion of expenses for the lawsuit with Dennis Gray?

A. Yes, we did discuss expenses for the lawsuit ...

Q. And there's a reference to expenses which are to be paid out of the return of a portion of the deposit monies, do you recall that?

A. Yes, that's correct.

Q. And those expenses were for legal fees which were being incurred by you with respect to this litigation in part, correct?

MR. BRILL: Objection, your Honor.

THE COURT: Overruled.

A. Yes, that's correct.

In spite of this testimony, Lapidus contends in his reply brief that the $25,000 was deducted to pay legal and engineering expenses in the effort to acquire the Water's Edge property, not legal expenses for the Lapidus–Gray lawsuit. Even so characterized, Loft and Stein's contribution of ⅝ of the expenses incurred in the effort to acquire the property supports our conclusion that Loft and Stein were partners with a financial interest in the venture.

9. Contrary to Lapidus's view, we see no error in the district court's unwillingness to attach dispositive significance to Loft's and Stein's refusal

## II.

■ Next, Lapidus contends that, even if there was a partnership, Loft and Stein had "a distaste" for his lawsuit against Gray and never agreed with him that their partnership interest would extend to proceeds from that lawsuit. This argument has no merit. Loft and Stein concede that, upon hearing of the lawsuit, they understood that Lapidus intended to "drag out" the lawsuit, that they thought this tactic dishonest, and requested that their capital contribution to the partnership be returned.[10] Nevertheless, after Lapidus clarified his intentions in the lawsuit, they ultimately withdrew this request and continued as partners. Stein advised Lapidus by the October 18 letter that, on behalf of himself and Loft, the earlier request for the return of capital was revoked, and that, as partners, they sought to be informed regarding the Lapidus–Gray lawsuit. Moreover, by Lapidus's own admission, Loft and Stein not only paid ⅝ of the deposit under the Purchase and Sale Agreement and were co-owners of it, but they also paid ⅝ of $25,000 "deducted" litigation expenses in the suit against Gray.

■ In any event, it is fundamental that Lapidus owed a fiduciary duty to Loft and Stein with respect to any transaction involving the partnership property, in this case, the rights under the Purchase and Sale Agreement, and was accountable to them for any profit that might accrue from such a transaction. *See* Mass.Gen.Laws Ann. ch. 108A, § 21(1); R.I.Gen.Laws § 7–12–32.[11] *See also* 2 A. Bromberg & L. Ribstein, *On Partnership* § 6.07; *Wartski v. Bedford,* 926 F.2d 11, 13 (1st Cir.1991); *Cardullo* 105 N.E.2d at 845 ("If the parties were either partners or coadventurers they owed to each other the utmost good faith and loyalty"). Loft and Stein, as co-owners of the rights under the Purchase and Sale Agreement, without question, had an interest in the settlement of claims under that agreement. Indeed, even Lapidus acknowledged at trial that the October 31 letter of intent contemplated that Loft and Stein would have an interest in the settlement proceeds.[12]

## III.

Lapidus's contention that Loft and Stein failed to assert a claim for a share of the settlement proceeds in this lawsuit is of no

to sign a tendered limited partnership agreement subsequent to the letter of intent. Loft and Stein did not sign because they did not believe it reflected the parties' earlier purported oral agreement that Lapidus would take title to the property it if were tendered. The district court resolved that there was no such oral agreement. The dispute regarding this issue, and the resultant refusal to sign a written limited partnership agreement, because it did not satisfactorily reflect Loft's and Stein's wishes on the taking of title, does not rule out the formation of an ongoing partnership as to the underlying venture, to which all three had contributed funds.

**10.** Lapidus also contends that Loft and Stein "abandoned" their rights in any relationship with him and in the Purchase and Sale Agreement when they requested that their $125,000 be returned in September 1988. He emphasizes that they considered the partnership over at the time they requested that their money be returned and even told Gray that they no longer had a partnership interest in the property. Yet, no money was ever returned, and the parties continued to discuss the terms of their partnership relationship, culminating in the signing of the letter of intent memorializing those terms

on October 31, 1988. Under these circumstances, Loft and Stein cannot be said to have abandoned their rights to their partnership interest in the settlement proceeds.

**11.** Mass.Gen.Laws Ann. ch. 108A, § 21(1) and R.I.Gen.Laws § 7–12–32 provide: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property."

**12.** Lapidus's testimony on cross-examination was as follows:

Q. On October 31st when you had your discussions with Mr. Loft and Mr. Stein it was contemplated there might be a settlement in the Gray litigation, isn't that right?
A. I would assume so, yes.
Q. As a matter of fact, your agreement or your accord reached on that date contemplated Mr. Loft and Mr. Stein might have an interest in that settlement, isn't that correct? Would have an interest in that settlement.
A. I believe so.

moment. Lapidus asserts that the complaint only sought specific performance of Lapidus's purported agreement to take title to the property if tendered, or, alternatively, damages for lost profits that would have accrued had the property actually been acquired. Yet, Lapidus overlooks the first demand in the complaint, to wit, "[t]hat Defendant be ordered to render an accounting of any monies obtained with respect to the real estate in question and to pay to Plaintiffs a sum equal to ⅚ of such monies." *See* 2 A. Bromberg & Ribstein, *On Partnership*, § 6.08; Mass.Gen.Laws Ann. ch. 108A, § 22; R.I.Gen.Laws § 7–12–33.[13] In addition, the complaint requests "[s]uch other relief as to this court seems fit and proper." The district court's more modest award of 25% of the settlement proceeds was plainly well within the scope of the relief requested in Loft's and Stein's complaint. *See Aggarwal v. Ponce School of Medicine*, 745 F.2d 723, 729 (1st Cir.1984) (a plaintiff is not strictly bound by the exact terms of the prayers for relief contained in his complaint); *Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 919 (8th Cir.1976).

### IV.

■ Finally, Lapidus argues that the district court improperly determined that Loft and Stein are entitled to prejudgment interest calculated at the 12% Rhode Island statutory rate. R.I.Gen.Laws § 9–21–10. Lapidus contends, rather, that the federal interest rate determined pursuant to 28 U.S.C. § 1961 should apply. However, section 1961 relates only to *post-judgment* interest, specifically providing that "[s]uch interest shall be calculated from the date of the entry of judgment...." State law governs the prejudgment interest rate. *Roy v. Star Chopper*, 584 F.2d 1124, 1135 (1st Cir.1978), *cert. denied*, 440 U.S. 916, 99

S.Ct. 1234, 59 L.Ed.2d 466 (1979). ("A federal court should properly apply a form state's prejudgment interest statute when sitting in a diversity case.")

Lapidus does not contend that the law of some other state should apply in lieu of Rhode Island's interest statute. Lapidus simply states in his brief on appeal:

Stein was a Massachusetts resident, Lapidus from New York, Loft from Rhode Island. Some of the negotiations took place in Connecticut. The Letter of Intent refers to a Massachusetts limited partnership.

The Water's Edge property was in Rhode Island, and both the Gray lawsuit and this action were filed in Rhode Island. Even if the parties' intent to form a Massachusetts limited partnership implicated Massachusetts law, Massachusetts also applies a 12% prejudgment interest rate. Mass.Gen. Laws Ann. ch. 231, § 6C. There is no reason in these circumstances to disturb the district court's application of the 12% rate.

■ Appellees seek sanctions because of the frivolity of this appeal. We agree that it is so lacking in merit as to warrant an award of double costs under Federal Rules of Appellate Procedure 38.

*Affirmed. Double costs to appellees.*

---

13. Mass.Gen.Laws Ann. ch. 108A, § 22 and R.I. Gen.Laws § 7–12–33 provide:

Any partner shall have the right to a formal account as to partnership affairs:

(a) If he is wrongfully excluded from the partnership business or possession of its property by his co-partners.

(b) If the right exists under the terms of any agreement.

(c) As provided by section twenty-one.

(d) Whenever other circumstances render it just and reasonable.