ELIZABETH H. WAGLEY & others[1] *vs.* ELIZABETH W.
DANFORTH & others.[2]

No. 97-P-1513.

Suffolk. October 5, 1998. - December 10, 1998.

Present: ARMSTRONG, GILLERMAN, & KASS, JJ.

*Contract,* Sale of real estate. *Partnership,* General partner, Agreement. *Real
Property,* Sale.

There was no merit to the claim of general partners of deficiency in the instru-
    ments by which successors to a general partner succeeded to his status,
    inasmuch as the general partners had voted to accept the successors as
    partners. [20]
A provision in a partnership agreement intended to protect third persons deal-
    ing with the partnership by authorizing two partners to bind the partnership
    did not create authority in the partners generally to sign instruments on
    behalf of the partnership. [20-21]
Provisions of a partnership agreement requiring unanimity of the general
    partners in order to act on behalf of the partnership prevailed over any
    contrary provision of G. L. c. 108A, § 18(*h*), under the explicit preamble
    to that statute. [21]
A provision in a partnership agreement, authorizing the general partners to act
    by majority rather than unanimity if that majority included a named partner,
    ceased to be effective upon the death of the named partner; as a
    consequence, after that partner had died, the partnership could not sell its
    sole asset, seventy acres of land on Nantucket, without the unanimous vote
    of the remaining general partners. [21-24]

CIVIL ACTION commenced in the Land Court Department on
September 3, 1996.

The case was heard by *Leon J. Lombardi,* J., on a motion for
summary judgment.

[1] John R. Wagley, Jr., as general partners of the Nashayte Associates Limited
Partnership, and John R. Wagley.

[2] Galen L. Beale, and Melinda L. Geddes, individually and as general
partners of Nashayte Associates Limited Partnership, and Arthur I. Reade, Jr.,
as trustee of Swain's Point Trust.

*Alan B. Rubenstein* for the plaintiffs.

*Edward Woll, Jr.,* for Elizabeth W. Danforth & others.

GILLERMAN, J. In December, 1991, Elizabeth R. Evans (Evans), the owner of approximately seventy acres of registered land on Polpis Harbor, Nantucket (property), established the Nashayte Associates Limited Partnership (partnership) to which she conveyed the property. The general partners were Evans and her four children, John R. Wagley (John), Elizabeth W. Danforth (Danforth), Melinda Geddes (Geddes), and Galen Beale (Beale). Evans, her children, and grandchildren were the limited partners. Evans and each of her four children owned a one per cent general partnership share; Evans owned a 74.6 per cent limited partnership share.

After the death of Evans in June, 1995, a dispute arose as to whether the defendant general partners (defendants)[3] — i.e., Danforth, Geddes, and Beale — had the authority under the limited partnership agreement (agreement) to sell the property without the approval of the plaintiffs Elizabeth H. Wagley (Elizabeth) and John R. Wagley, Jr. (John, Jr.). Elizabeth and John, Jr., are the children of the plaintiff John. They claim to be general partners by reason of the bankruptcy of their father, see note 12, *infra,* and they commenced this action in the Land Court to enforce their alleged right to object to the proposed sale.

A judge of that court allowed a motion for summary judgment (filed originally as a motion to dismiss) in favor of the defendants, and this appeal followed.[4]

The defendants claim that under the provisions of the partnership agreement, they rightfully accepted, on behalf of the partnership, an offer to purchase the property dated August 8,

---

[3]No brief was filed by the defendant Arthur I. Reade, Jr., the putative purchaser of the property.

[4]The defendants preliminarily argue that the judge improvidently entered a separate and final judgment, under Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), on counts I (petition for declaratory judgment), II (breach of limited partnership agreement), and III (breach of fiduciary duties), leaving count IV (breach of agreement among the children of Evans regarding their individual purchases of the property) for further proceedings. The argument has no merit. A certification under rule 54(b) is not to be reversed except upon an abuse of discretion, see *United States Trust Co.* v. *Herriott,* 10 Mass. App. Ct. 313, 321-322 (1980), and we see none here. Elizabeth and John, Jr., not being "children of Evans," are not parties to count IV.

1996, for $7,200,000. That claim is at the center of this controversy. We set forth certain undisputed material facts.

The property was first listed for sale with real estate brokers on April 19, 1996, for $7,800,000. That listing was signed on behalf of the partnership by the defendant general partners, by Stanley Dale Klett (Klett), executor under the will of Evans, and by the plaintiffs John, Elizabeth, and John, Jr.

Under date of August 8, 1996, a written offer to purchase the property for $7,200,000 was submitted to the partnership. The offer form was executed in quadruplicate by the buyer. Each of the defendants, and Klett, counter-signed a separate copy of the offer to purchase. On the date lines immediately above the signatures of Beale, Geddes, and Klett, no date appears. The date on which Danforth signed appears to be August 9, 1996. John, Elizabeth, and John, Jr., did not sign an acceptance of the offer. A purchase and sale agreement was executed on August 27, 1996. Danforth and Geddes signed for the partnership.[5]

Whether the acceptance of the offer to purchase by a majority of the general partners[6] was binding on the partnership turns on the terms of the partnership agreement. In interpreting the partnership agreement — a matter of law on which we are not bound by the conclusions of the trial judge, see *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755 (1973) — we set out the background and circumstances of the adoption of the partnership agreement, as revealed in the submissions of the parties.[7] See *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995) ("[w]e must 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished' "); *Robert Indus., Inc.* v. *Spence, supra* at 755

---

[5]Paragraph 10(c) of the partnership agreement provides that third parties may rely on the signatures of two general partners. Reade, the putative buyer of the property, filed a counterclaim against Elizabeth and John, Jr., as well as a cross claim against the defendants Geddes and Danforth, on the basis of this paragraph. Reade's motion for summary judgment was allowed; Elizabeth and John, Jr., neither sought nor obtained rule 54(b) certification as to that ruling, and this claim is not before us on this appeal. See note 4, *supra*.

[6]Elizabeth and John, Jr., as successors to their father's general partnership interest, see note 12, *infra*, together had one vote, or one action, under paragraph 11(c) of the partnership agreement.

[7]In their brief to the Land Court, and in their brief to this court, the defendants wrote that the sole issue on appeal was the authority of the defendants to sell the Nantucket property, "[a]nd all facts relevant to that issue are undisputed."

("[i]nterpretation is directed to the meaning of the terms of the writing in the light of the circumstances"); *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 851 (1973) ("[the disputed provision] is not self-interpreting — no form of words is — and the evidence could be received and used to elucidate its meaning in context").

The first draft of the partnership agreement was prepared by counsel to the partnership, Walter Van Dorn (Van Dorn), and was circulated on October 29, 1991. A memorandum from Van Dorn to each family member and Klett (at that time, counsel to Evans) drew attention to the provision that the general partners were required to act unanimously in order to bind the partnership. Absent unanimity, no general partner had the power to bind the partnership.

Van Dorn's memorandum prompted discussion with Klett about the unanimity clause. An affidavit of Van Dorn filed in support of the defendants' motion to dismiss states that "Klett was concerned that one of the children would have the power to veto decisions that Mrs. Evans might wish to make, and he requested that *paragraph 10(f) be modified* to address his concern" (emphasis added). On November 21, 1991, Klett wrote Evans commenting on the various provisions in the draft partnership agreement. Concerning the requirement of unanimity, he wrote, "This means that if any of the general partners disagree with the distribution that you require for your support or maintenance, the partnership would not be able to make that distribution." Klett made no suggestion to resolve the problem. That, apparently, was left to Van Dorn.

In response to Klett's comments, Van Dorn revised the draft agreement. He left intact the first sentence regarding unanimity and inserted a new second sentence in paragraph 10(f). As finally approved and signed,[8] paragraph 10(f) provided as follows:

> "In the event more than one person is a General Partner, the rights and powers of the General Partners shall be exercised by them in such manner as all General Partners may agree in writing. *In the absence of any such agreement among the General Partners, a majority of the General Partners may exercise on behalf of the Partner-*

[8]The partnership agreement, signed in numerous counterparts, appears to have been dated on various dates in late November and early December, 1991.

*ship the rights and powers of all the General Partners
provided the majority so acting includes Elizabeth R.
Evans.*" (The emphasized sentence — the emphasis is ours
— was the sentence added to the first draft).

The partnership agreement, as revised, was signed by the
four children and Evans. No family member, or Klett (who,
presumably, approved the new second sentence), suggested that
the first sentence requiring unanimity should be deleted.

Under the revised paragraph 10(f), then, all the general
partners were to act in concert and, failing that, a majority of
the general partners, including Evans, could effect action.[9]

There matters stood until the spring of 1993 when Evans's
children became concerned that their mother was no longer able
to make thoughtful decisions. The defendant Beale requested
that Van Dorn express his opinions regarding paragraph 10(f).
On April 16, 1993, in response to that request, Van Dorn wrote
to each of the defendants and John[10] regarding the second
sentence of paragraph 10(f): "[a] majority of the general
partners are empowered to act on behalf of the partnership
provided the majority (currently three general partners) includes
Elizabeth R. Evans. Assuming Mrs. Evans is legally competent,
such a majority could so act provided she was one of the major-
ity. If Mrs. Evans is not legally competent to act, or if she did
not act as part of the majority, *then the second sentence . . . is
inoperative.*"[11] (Emphasis added).

Again, the subject of the partnership agreement was left
undisturbed until August 8, 1996, the date of the buyer's offer
to purchase the property. On the same date, Edward F. Vaughan

---

[9]It would seem that the only way Evans could be assured, unconditionally,
of avoiding a veto by her children was for Evans to have the power to act
alone for the partnership. Our attention has not been directed to anything in
the record or briefs which suggests that such a provision was ever discussed.

[10]Van Dorn seems to have been unaware that on April 3, 1993, Elizabeth
and John, Jr., accepted in writing their "elevation" to general partner status,
until such time as John was discharged from bankruptcy. See note 12, *infra.*

[11]Our deletion is the word "also." Earlier in his letter Van Dorn had
concluded that the first sentence of paragraph 10(f) was "inoperative" for
reasons that are not entirely clear. In any event, Van Dorn concluded that upon
the legal incompetency of Evans, both sentences of paragraph 10(f) became
"inoperative," with the result that the "statutory requirement of unanimity
prevails." See G. L. c. 109, § 24, and c. 108A, § 18(*h*). The letter was an
expression of Van Dorn's opinion to the four children that the unanimity
requirement would prevail over the legal incompetency of Evans.

(Vaughan), counsel to the partnership, prepared an amendment to the partnership agreement. The amendment did no more than delete the proviso in the second sentence of paragraph 10(f) (viz., "provided the majority so acting includes Elizabeth R. Evans"); the amendment retained the first sentence requiring unanimity, and the language in the second sentence up to the proviso.

The odd result of this amendment was that under the first sentence of paragraph 10(f), the partnership could act on any matter only by the *unanimous* vote of the general partners, and under the second sentence of paragraph 10(f), the partnership could act on any matter by a *majority* of the general partners.

The amendment was signed by the defendant Geddes on August 8, 1996, by the defendants Beale and Danforth on August 13, 1996, and by Klett on behalf of the estate of Evans on August 26, 1996. No party has brought to our attention anything in the record suggesting that, at or about the time of the signing of the amendment, any of the three signatory children, or Klett, objected to the retention of the unanimity requirement appearing in the first sentence of paragraph 10(f).

Danforth signed the amendment *after* she signed the acceptance of the offer to purchase the property, and it remains uncertain whether Beale and Geddes signed the amendment before or after their acceptance of the offer. The plaintiffs John, Elizabeth, and John, Jr., did not sign the amendment. The defendants make no argument that the amendment, if valid, had the effect of validating the preamendment action of Danforth. Because we decide this case on other grounds, we need not consider this question further.

The defendants maintain in these proceedings that no more than a majority of the general partners was required to sell the property. In support of this position, they argue first that the instruments of "elevation" to general partner status signed by Elizabeth and John, Jr., were defective. For the reasons stated in the margin,[12] this argument has no merit.

Second, they argue that paragraph 10(c) of the partnership

---

[12]We need not discuss this claim in any detail. On March 28, 1993, the defendants, at a meeting of the general partners, voted to accept Elizabeth and John, Jr., as general partners of the partnership. Further, we are persuaded, *as between the parties to this litigation*, see *Loft* v. *Lapidus*, 936 F.2d 633, 636 n.5 (1st Cir. 1991), that the instruments signed by Elizabeth and John, Jr., were adequate for the intended purpose. Paragraph 11(c) of the partnership

agreement authorizes two general partners to bind the partnership. That section — which provides that persons dealing with the partnership may rely conclusively on the signature of any two general partners — is merely intended to protect third persons dealing with the partnership. The section does not create authority to sign instruments on behalf of the partnership, and has no bearing on this case. See note 5, *supra.*

Third, the defendants argue that G. L. c. 108A, § 18(*h*) (see G. L. c. 109, § 24), authorizes this sale of partnership assets by majority vote. Section 18(*h*) provides that "[a]ny difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners. . . ." Assuming the doubtful proposition that the sale of all the assets of a partnership is an "ordinary matter," the section is inapplicable to this case. The preamble to all the subsections of § 18 states that the rules of the section are "subject to any agreement between [the partners]. . . ." Paragraph 10(f) of the partnership agreement, as interpreted below, is such an agreement to which the preamble refers.

Fourth, the defendants argue that, under paragraph 19 of the partnership agreement, the amendment did not require the signatures of Elizabeth and John, Jr. That argument turns on whether the amendment itself was within the provisions of the partnership agreement. We think not.

So far as material, paragraph 19 of the partnership agreement provides, "This agreement may be amended by a majority of the General Partners as provided in subparagraph 10(f). . . ." This brings us to the pivotal question in this appeal: the proper construction of paragraph 10(f) *prior to the amendment.*

Clearly, paragraph 19, prior to the death or incapacity of

agreement provides that Elizabeth and John, Jr., will succeed John as general partner upon his bankruptcy if they "agree to serve and to be bound by this Agreement in all respects." The instruments signed by Elizabeth and John, Jr., both dated April 3, 1993, state, "This is to reconfirm my acceptance of my elevation to Co-General Partner from Limited Partner until my father's being re-elected General Partner upon discharge from Chapter VII Bankruptcy." These words are, in substance, equivalent to the required undertaking that the successor "agree to serve and to be bound by this Agreement." Furthermore, on June 25, 1993, Beale, in a letter to a third person, made reference to the fact that Elizabeth and John, Jr., were general partners "since January [1993]."

The reference to "Co-General Partner" in the acceptance letter of April 3, 1993, had to do with Elizabeth and John, Jr., as the two successors to their father John, sharing a single vote.

Evans, permitted amendments adopted by a majority of the general partners if Evans was part of that majority; that authority was created by the final draft of the second sentence of paragraph 10(f). The question thus becomes whether the second sentence of 10(f) — following the death of Evans and *prior* to the amendment — authorized action by a majority vote of the general partners. Stated differently, when Evans, by reason of her death, would no longer be able to participate in the decision-making process of the partnership, did the parties intend, prior to the amendment, that the *proviso alone* would simply drop out, leaving the authority to act in a majority of the general partners, or did the fact that the proviso had become moot by reason of Evans's death nullify the entire second sentence, leaving the unanimity requirement of the first sentence the decisive provision?

We conclude, for a number of reasons, that upon the death of Evans the authority of the general partners to act by a majority vote expired.

First, the evident purpose of the amendment was to provide a certain and clear answer to the question stated above, namely, that the proviso would simply drop out leaving the right of a majority to act intact. The amendment itself — which was executed at or about the date or dates the defendants accepted the offer to purchase and *plainly was intended to be part of the same transaction* — appears to have been an acknowledgment by the defendants that *without* the amendment the entire second sentence of paragraph 10(f) would cease to be effective following the death of Evans, and a mere majority of the general partners could not accept the offer to purchase. Such was the opinion of Van Dorn when he responded on April 16, 1993, to all the defendants regarding the consequences of the incapacity of Evans, and it is reasonable to infer that it was that opinion which precipitated the amendment.

Second, the addition of the revised second sentence to the original draft of paragraph 10(f) left the first sentence — requiring unanimous action by the general partners — intact. If it was originally intended that upon the death of Evans, when the proviso would become moot, a majority would unconditionally control, the first sentence requiring unanimity would have been deleted.

Third, the primary purpose of the second sentence of paragraph 10(f) was to provide written assurance to Evans that,

by voting in the negative so as to prevent a unanimous vote, or by not voting with a majority, she could prevent any affirmative action against her personal interests, such as the termination of her support payments.[13] Indeed, the second sentence would not have been inserted but for the advice of Klett to Evans that the unanimity clause had to be "modified" — not deleted — *for the benefit of Evans alone*. Following the death of Evans, that purpose could no longer be served. Further, the interest of Klett as executor following Evans's death (assuming Klett could exercise Evans's rights as general partner — a questionable proposition since the partnership agreement provided that the successor in interest of a deceased general partner became a limited partner) was distinct from the personal interests of Evans during her lifetime. Thus, following the death of Evans, the second sentence, no longer capable of serving any purpose within the contemplation of the parties, would cease to be effective, leaving the original first sentence in place and operative in all circumstances. This conclusion is entirely consistent with the basic, original design of the partnership agreement: as just noted, only the original family members could be general partners, they could only act unanimously unless Evans otherwise agreed, and there was no contrary suggestion by any family member, or Klett, from the inception of the partnership in 1991 until the family disagreement arose in the summer of 1996.

Fourth, the second sentence, *by its express terms*, was not applicable unless Evans was in the majority; when Evans could no longer make up a majority, the clause had no further meaning or purpose.[14] It was a clause, in short, clearly designed for the personal benefit of Evans during her lifetime so long as she was alive and legally capable of making decisions.

Finally, the defendants rely on G. L. c. 109, § 43, which authorizes a personal representative of a deceased partner to exercise the rights of a deceased partner for purposes of settling the estate. That provision has no application to this case where (i) Klett, as successor to the interest of Evans, had only a limited partnership interest without any voting power, and (ii) following

[13]An additional purpose of the second sentence of paragraph 10(f) was to enable Evans to enact her proposals if she put together a majority.

[14]As the plaintiffs point out, the proviso made no provision for the inclusion of Evans's personal representative as her successor in interest — further evidence that the proviso was personal to Evans.

the death of Evans, as we have concluded, the sale of the property could only be accomplished upon the unanimous vote of the general partners. Regardless of Klett's position, the objections of Elizabeth and John, Jr., precluded the sale. The defendants' reliance on § 43 is misplaced.

We conclude that the unanimous vote of the general partners was required for the sale of the property. Given the defendants' acknowledgment, to which we subscribe, that there are "no disputed issues of fact that would bar summary judgment," judgment is to be entered in favor of the plaintiffs on the defendants' motion for summary judgment. See Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). See also *Bonitz* v. *Travelers Ins. Co.*, 374 Mass. 327 (1978) (judgment affirmed where, on defendant's motion for summary judgment, the Superior Court ordered partial summary judgment for the plaintiff; defendant's argument on appeal that other defenses to the action were available was dismissed as "an afterthought"). The partial judgment of the Land Court is reversed, and a declaratory judgment is to enter on count I of the amended complaint that a unanimous vote of the general partners of the Nashayte Associates Limited Partnership was required for the sale of the property. The case is remanded to the Land Court for further proceedings consistent with this opinion on counts II, III, and IV of the amended complaint, as well as on the defendants' counterclaims and cross claim. See note 5, *supra.*

*So ordered.*